# Richmond

INDUSTRIAL DEVELOPMENT AUTHORITY OF THE CITY OF RICHMOND, VIRGINIA v. LA FRANCE CLEANERS AND LAUNDRY CORPORATION.

September 5, 1975.

Record No. 750026.

Present, I'Anson, C.J., Carrico, Harrison, Cochran, Harman and Poff, JJ.

*Albert J. FitzPatrick, Assistant City Attorney; Lewis T. Booker (C. B. Mattox, Jr., City Attorney; John B. Ashton; Hunton, Williams, Gay & Gibson,* on brief), for plaintiff in error.

*Joseph B. Benedetti (Tom Dixon Johnston; Minor, Saunders & Benedetti,* on brief), for defendant in error.

POFF, J., delivered the opinion of the court.

The question before us is whether the trial court erred in sustaining the challenge of La France Cleaners and Laundry Corporation (La

France) to an industrial development revenue bond issue and certain interim borrowings authorized by the Industrial Development Authority of the City of Richmond, Virginia (IDA), to finance construction of a laundry facility. The facility, already under construction, is to be leased to and operated by Virginia Hospital Laundry, Inc. (VHL).

By letter dated August 20, 1970, the Director of the State Division of Corrections advised the Medical College of Virginia (MCV) that it had become necessary to impose a limit on the laundry services furnished MCV and another state hospital by the State Farm for Women and that if the "inmate population . . . continues to drop it may be necessary to make further reductions." Upon MCV's initiative, a group of governmental and charitable hospitals in the Richmond area organized VHL as a non-profit corporation to establish and operate a hospital laundry cooperative for the benefit of member hospitals, each of which will be represented on VHL's board of directors. After two consulting firms employed by VHL reported that the project was feasible, La France offered to construct a new commercial facility which it said could serve the hospital's laundry requirements at lower cost and with no administrative burden. VHL decided to pursue its own project and contracted with Richmond Redevelopment and Housing Authority to buy a site in Shockoe Valley of Richmond near the Mosby Court Redevelopment Project, an area of high unemployment.

On October 23, 1973, VHL asked IDA to adopt a resolution authorizing $3,000,000 in revenue bonds to finance the project. On November 9, 1973, and November 20, 1973, IDA met to consider certain supporting data submitted by VHL. At its meeting on November 29, 1973, IDA adopted a resolution authorizing the bond issue upon the finding that,

> ". . . the location of a laundry facility in the City of Richmond will promote the industrial development and economy of the city, will be of benefit to its inhabitants and will be consistent with the purposes of the Act."

On August 24, 1974, the Internal Revenue Service granted the bonds tax-exempt status and VHL asked IDA to place them on the market. On September 19, 1974, La France filed a petition seeking to enjoin IDA from issuing the bonds. Under a resolution adopted October 16, 1974, authorizing interim financing, IDA negotiated a bank loan, pur-

chased the site, exercised options on machinery and equipment, awarded the construction contract, and commenced construction. On November 1, 1974, La France filed a petition for a permanent injunction against interim financing.

The trial court ruled that the September 19, 1974, petition be treated as a motion for judgment contesting issuance of bonds under Code § 15.1-216 (Repl. Vol. 1973) and consolidated that motion for trial with the November 1, 1974, petition.

By final decree entered December 23, 1974, incorporating a letter opinion dated December 11, 1974, the trial court invalidated the issuance of the bonds and the interim financing and enjoined IDA from borrowing additional funds to finance VHL's project.

■ Code § 15.1-1375 (Repl. Vol. 1973) provides in part:

". . . It is the intent of the legislature by the passage of this chapter to authorize the creation of industrial development authorities by the several municipalities in this Commonwealth so that such authorities may acquire, own, lease, and dispose of properties to the end that such authorities may be able to promote industry and develop trade by inducing manufacturing, industrial, governmental and commercial enterprises to locate in or remain in this Commonwealth and further the use of its agricultural products and natural resources, and to vest such authorities with all powers that may be necessary to enable them to accomplish such purposes, *which powers shall in all respects be exercised for the benefit of the inhabitants of the Commonwealth, for the increase of their commerce and for the promotion of their safety, health, welfare, convenience and prosperity.* It is not intended hereby that any such authority shall itself be authorized to operate any such manufacturing, industrial or commercial enterprise." (Emphasis supplied).[1]

IDA contends that the trial court erred in its interpretation of that statute. In his letter opinion, the trial judge recited from the emphasized language and ruled,

---

[1] At its 1975 session, the General Assembly amended the emphasized language to read:

". . . which powers shall be exercised for the benefit of the inhabitants of the Commonwealth, either through the increase of their commerce, or through the promotion of their safety, health, welfare, convenience or prosperity." Ch. 489, Acts of Assembly 1975.

This amendment expressly provides that it does not "affect any litigation pending in any court prior to the effective date of said amendments."

"It would further appear, not only from the fact that the requirements are stated in a conjunctive and not a disjunctive manner, but also from the language of the court in *Chesapeake Development Authority v. Suthers*, 208 Va. 51, that *all* of these elements must be present . . . ." (Emphasis supplied by the trial court).

A statute designed to induce new industries to locate in the Commonwealth "serves primarily a public purpose and thus constitutes a proper function of government." *Development Authority v. Coyner*, 207 Va. 351, 358, 150 S.E.2d 87, 93 (1966). The Industrial Development and Revenue Bond Act, Code §§ 15.1-1373, *et seq.* (Repl. Vol. 1973), is designed to induce industries to locate in "or remain in" the Commonwealth. In *Chesapeake Development Authority v. Suthers*, 208 Va. 51, 155 S.E.2d 326 (1967), the constitutionality of that Act was challenged on the ground that the purpose of inducing an existing industry to remain in the Commonwealth constituted a private purpose. Rejecting that challenge, we said:

"What the respondent overlooks, however, is that the same Code section upon which he relies confines the Authority in the exercise of the powers conferred upon it to those situations which are 'for the benefit of the inhabitants of the Commonwealth, for the increase of their commerce, and for the promotion of their safety, health, welfare, convenience and prosperity.' Only if those elements are present in a proposed undertaking is the Authority authorized to act." 208 Va. at 59, 155 S.E.2d at 333.

That language simply declares what the Act itself provides, *viz.*, that the powers conferred may be exercised only if a public purpose is promoted. Each of the several "elements" recited in Code § 15.1-1375 is an indicium of a public purpose. Contrary to the trial court's reading, we did not hold that the purpose is not public unless ". . . all of these elements . . . [are] present".

In his ruling, the trial judge also relied upon the fact that, in the statute, "the requirements are stated in a conjunctive and not a disjunctive manner". Such reliance is misplaced.

"[W]henever it is necessary to effectuate the obvious intention of the legislature, disjunctive words may be construed as conjunctive, and *vice versa*." *South East Public Service Corp. v. Commonwealth*, 165 Va. 116, 122, 181 S.E. 448, 450 (1935).

We believe that the legislative intent would be completely aborted if the conjunctive words in this statute are not construed as disjunctive. Under Code § 15.1-1374(d), eligible "facilities" are defined to mean "any or all medical (including, but not limited to, office and treatment facilities), pollution control and industrial facilities". Clearly, a purely industrial facility would satisfy the commerce "element" but hardly the health "element", while a charitable medical facility would satisfy the latter but not the former. Yet, the General Assembly plainly intended that both facilities be eligible.

We hold that, in order "to effectuate the obvious intention of the legislature", the conjunctive words in Code § 15.1-1375 must be construed as disjunctive.[2]

■ Considering "whether there was before the Authority, at the time it took the action, any credible evidence to justify the action", the trial court found that certain of the data VHL furnished IDA in support of its project "were shown, by the overwhelming evidence, to be false" and that "[t]he evidence conclusively establishes that the VHL project, as contemplated, meets no one of these [statutory] requirements, much less all." We must decide what standard of judicial review is applicable and whether, applying that standard, the findings of the trial court are supported by the law and the evidence.

As "Authority" is defined in the Act, IDA is "a body politic and corporate", Code § 15.1-1374(a), "with such public and corporate powers as are" delegated in the Act, Code § 15.1-1376(a). Such powers are legislative powers and their exercise is a legislative function. It follows that the applicable standard of judicial review of the action of an "Authority" is that applied to legislative actions. A court must uphold a legislative action if, in the face of evidence of unreasonableness, ". . . evidence of reasonableness is sufficient to make the question fairly debatable . . . ." *City of Richmond* v. *Randall*, 215 Va. 506, 511, 211 S.E.2d 56, 60 (1975). *See also, Bd. of Supervisors of*

---

[2] Following the decision in the court below, the Commission to study Industrial Facilities Financing recommended the amendment adopted by the General Assembly at its 1975 session. *See* footnote 1. While we recognize that a post-enactment statement is not determinative of legislative intent, we note the following statement in an addendum to the Commission's official report, Senate Document No. 24, 1975 Session of the General Assembly:

"The ad hoc General Assembly group concluded that such an interpretation [construing the words as conjunctive] was not what was originally intended when the Act was adopted by the General Assembly in 1966 and that such an interpretation would be fatal to the present program of financing industrial facilities through revenue bonds and disasterous [sic] to industrial development in the Commonwealth."

*Fairfax County* v. *Williams,* 216 Va. 49, 216 S.E.2d 33 (1975); *Bd. of Supervisors of Fairfax County* v. *Allman,* 215 Va. 434, 211 S.E.2d 48 (1975); *Fairfax County* v. *Snell Corp.,* 214 Va. 655, 202 S.E.2d 889 (1973).

One of the issues debated on appeal was what evidence a court must consider in applying that standard of review. Must a court consider only evidence actually produced before the legislative body at the time it acted, or must it consider all of the evidence adduced at trial, including evidence concerning circumstances subsequent to the legislative action?

Although legislative bodies sometimes choose to conduct hearings and investigations in aid of legislation, they do not always do so, and, absent a constitutional or statutory mandate, they are not obligated to do so. " 'Courts are not concerned with the motives which actuate members of a legislative body in enacting a law . . .' ", *Blankenship* v. *City of Richmond,* 188 Va. 97, 105, 49 S.E.2d 321, 324 (1948), and, in the exercise of its legislative discretion, a legislative body is presumed to have been cognizant at the time it acted of all existing facts and circumstances bearing upon the public policies and private rights relating to their action. *See, Ward & Gow* v. *Krinsky,* 259 U.S. 503, 521 (1922); *Middleton* v. *Texas Power & Light Co.,* 249 U.S. 152, 157 (1919). *See also, Arkansas Natural Gas Co.* v. *Arkansas Ry. Comm'n,* 261 U.S. 379, 384 (1923). In determining "reasonableness", therefore, a court must look not to what a legislative body was told or to what it knew when it acted, but to what it could have known at that time.

Accordingly, we hold that a court reviewing a legislative action must consider all competent evidence adduced at trial concerning facts and circumstances existing at the time the legislative action was taken; if evidence of such facts and circumstances is sufficient to make the reasonableness of the legislative action "fairly debatable", the court must uphold that action; and whether deliberate or innocent, misrepresentations of facts and circumstances made before a legislative body will not invalidate legislative action[3] if the evidence shows that any facts and circumstances existing at the time it was taken were sufficient to sustain it. *See, County Bd. of Supr's* v. *American Trailer*

---

[3] "[T]he position has been taken that an ordinance is not rendered invalid because of lobbying activities or because councilmen had been subject to duress and coercion in enacting the ordinance, or because persons interested had made fraudulent misrepresentations to councilmen to induce their action." 5 E. McQuillin, *Municipal Corporations* § 16.90 (289) (3rd ed. 1969).

*Co.*, 193 Va. 72, 81, 68 S.E.2d 115, 121 (1952). *See also, U. S.* v. *Carolene Products,* 304 U.S. 144, 154 (1938); *Munn* v. *Illinois,* 94 U.S. 113, 132 (1876).

Guided by the several rules we have posited, we now consider whether the relevant evidence before the trial court was sufficient to show that IDA's action was designed to promote a public purpose.

Much of the data VHL furnished IDA in support of its project was intended to show that commercial laundries were doing a negligible amount of work for hospitals, were uninterested in such work, and were unequipped and unqualified to meet special hospital requirements. At trial, La France introduced rebuttal evidence and other evidence related to the adverse economic impact the VHL project will have upon commercial laundries, and the trial court found that VHL's data "were shown . . . to be false". However, economic impact on existing industries is only one factor bearing upon the reasonableness of an industrial development project, and, as we have said, even if all of the VHL data were "false", this would not invalidate IDA's action if other evidence of other facts and circumstances existing at the time the action was taken is sufficient to show that it was designed to promote a public purpose.

Laying this data aside, we look to the sufficiency of the other evidence. None of the member hospitals is operated for private gain, and La France concedes on brief "that the hospitals concerned fill a vital public need and . . . that projects that genuinely benefit these hospitals will genuinely benefit the public." Manifestly, efficient, reliable laundry and linen service is essential to the successful operation of a hospital. In light of the public health and welfare purpose a hospital promotes, the expense of laundry service, though a substantial part of the patient-care budget, is secondary in importance to the quality and dependability of that service.

Administrators of the member hospitals testified that their decisions to participate in the VHL project were prompted by their dissatisfaction with the service they were receiving and their expectations of better service from the new facility. Asked to describe some of the problems he had experienced in the period preceding IDA's approval of the VHL application, one administrator testified:

"It is the disorganized manner in which the laundry is received. That is to say, when it comes back it is not sorted. A basket or hamper will be returned to us, and we have no idea what is in that

hamper. They mix everything together. The hampers, until this past summer, were used both for clean and dirty linen alike . . . .

"The laundry comes back spotted. It is gray more often than white. We even have it coming back wet at times—or damp. Probably the biggest thing which would cause us to look elsewhere is the manner of charging. We have no idea how they developed these charges. The laundry is not counted when it leaves the hospital. When it comes back, we just get a bill. And it is impossible for us to identify the accurate charge. We are left totally to the mercy of the laundry."

Another hospital administrator testified:

". . . Most of the time, there is a delay. We can't get the linen when we need it. If something comes back scorched or stained, we always have to go through a hassle to get the cooperation that we feel is needed. We just don't feel that they are meeting us halfway."

The MCV administrator had told IDA

"We at that time were dependent on the State Farm to a large degree, and we had no control over the number of female prisoners that the courts might send or didn't send or what their attitude would be. I mentioned that we could always tell what their temperament was out there. When they got mad, they used to send things back to us other than linen—things like little notes sometimes, things from the bathroom sometimes, and just whatever it happened to be. If things were happy out there, it went pretty well. But we had no control as we do in most of our other operations."

As illustrated by the following excerpts from their testimony, the hospital administrators felt that membership in VHL would increase hospital control over laundry operations and that this would ensure better service for their special needs:

". . . VHL obviously is going to be a hospital-oriented laundry . . . . [A]ll of the hospitals involved will have common needs and common problems."

•   •   •

"[I]t is my feeling that VHL, since it is controlled and its costs are controlled by the users, would produce a level of service beyond what we receive . . . ."

•   •   •

"Again I think it would be the input that you would have over the control of it. It is just like any other service that you would have a managerial hand in."

•  •  •

"The short-term advantage will have to be just increased control. We will get rid of the hassle. We will increase what we feel is the amount and the quality of linen that is coming through. We will have less problems with deliveries. We just feel the overall quality to the hospital will be increased in the short run."

"Well, the next step in the control would be improvement in patient care. That is, cleanliness, appearance, and dependability. Perhaps if you compare product with price, I think cost. If you compare equal service to price, I think it will be less expensive. It may not be in absolute terms less expensive; but I think the fact that we could have actual production of items for surgery the way we need them—that is, the type of drape, the type of pack, perhaps folded, not necessarily but to the degree that hospitals could accept it, we could fold them in a certain way, and they wouldn't have to be refolded. The removal of stains. Cleanliness. Folding. All of those would ultimately accrue to the benefit of the patient."

As to comparative costs of service, one of the administrators testified that while VHL service might require a "slight increase the first couple of years", the long range effect "should be a financial advantage." All of the administrators agreed that their hospitals would be willing to pay more to get the quality of service they expected VHL to provide.

Applying the fairly debatable standard, we believe that the evidence at trial concerning facts and circumstances existing at the time IDA approved the VHL project was sufficient to satisfy the statutory command that an authority's powers "be exercised for the benefit of the inhabitants of the Commonwealth . . . and for the promotion of their . . . health [and] welfare" and was, therefore, sufficient to show that IDA's legislative action was designed to promote a public purpose.

The judgment is reversed and final judgment will be entered here vacating the injunction and validating the bond issue and the interim financing authorized by IDA's resolutions of November 29, 1973, and October 16, 1974, and the actions taken pursuant thereto.

*Reversed and final judgment.*