## CIRCUIT COURT OF FAIRFAX COUNTY

McLean Hamlet Citizens, Inc., et al.

v.

Fairfax County
Board of Supervisors et al.

October 25, 1995

Case No. (Chancery) 137177

BY JUDGE ROBERT W. WOOLDRIDGE, JR.

This matter came before the Court for trial on July 24-29, 1995, without a jury. At the conclusion of the trial, the Court took the matter under advisement.

Petitioners (collectively also "McLean Hamlet") ask the court to set aside decisions of the Board of Supervisors of Fairfax County relating to certain property located at the southwest quadrant of the Dulles Airport Access Road and Interstate 495 ("the subject property"). Petitioners are residents of a subdivision located directly across the Dulles Airport Access Road ("DAAR") from the property. The subdivision homeowners' association is also a Petitioner. Defendant, the Board of Supervisors of Fairfax County approved a proffered condition amendment and a special exception for the subject property in October, 1994. Defendant Gannett Co., Inc. is the contract purchaser of the subject property and was the special exception applicant. Defendant WEST*PARK Associates Limited Partnership is the owner of the subject property and applied for the proffered condition amendment. Defendant WEST*GROUP, Inc. acted as agent for a group of co-applicants for the proffered condition amendment. As their interests are indistinguishable for purposes of this proceeding, all of the

WEST\*GROUP, Inc., and WEST\*PARK entities shall be referred to as "WEST\*PARK."

McLean Hamlet asserts that the actions of the Board of Supervisors should be reversed on both procedural and substantive grounds. On procedural grounds, McLean Hamlet alleges in Count I of its petition that the notice requirements of § 15.1-431 of the Code of Virginia for certain 1994 amendments to the Fairfax County Comprehensive Plan were not met. On substantive grounds, McLean Hamlet contends in Count II that the subject property was illegally, unreasonably, and arbitrarily designated as a gateway; in Count III, that the actions of the Board of Supervisors were arbitrary and capricious, solely served the private interests of the other defendants, and constituted illegal spot zoning; in Count V, that the special exception approval violates existing zoning ordinances and has a detrimental effect on the community; in Count VI, that the granting of the special exception was illegal because it does not reduce as much as possible the negative impact on adjacent property; and in Count VII, that the actions of the Planning Commission and Board of Supervisors were inconsistent with the comprehensive plan.

In Count IV, McLean Hamlet alleged that by virtue of certain proffers made in 1990, it received protection that was violated by the granting of the special exception and the proffered amendment, and therefore, the actions of the Board of Supervisors constituted illegal conditional zoning. This Court earlier dismissed Count IV with prejudice on a Demurrer.

For the reasons stated below, the Court finds in favor of the Defendants and dismisses the Petition.

### Procedural and Factual Background

A comprehensive plan is adopted or amended by vote of a locality's governing body, in this case the Board of Supervisors, following consideration by the Planning Commission. Section 15.1-446.1 *et seq.* of the Code of Virginia. Before the comprehensive plan amendments at issue in this case, the Fairfax County Comprehensive Plan was last amended in March, 1992. That version of the Comprehensive Plan at page 201 as it relates to the Tysons Corner area provides in part:

*Gateways*

Because Tysons Corner is an area where development characters are distinctively different from the surrounding residential areas, appropriate gateway features can be placed at the major entrances to the area to announce the entering or leaving of the

area and change of characters for viewers on high speed paths such as I-495 and the DAAR. One or a group of significant buildings could be used for this purpose. For viewers on Routes 7 and 123, appropriate landscaping and signing may be sufficient because the speed limit is lower on these paths and the viewers are better able to notice and appreciate details.

The March 1992 Comprehensive Plan also provided guidelines for the height of buildings in the Tysons Corner area.

From 1990 to 1994, there existed a Tysons Corner Task Force consisting of representatives of the business and civic communities. It met regularly with the primary purpose of providing a plan for the development of the Tysons Corner area. As a task force, it was purely advisory in nature and authority. As of March 1, 1994, the Task Force had approved a draft Tysons Corner Urban Center Plan, also known as the Tysons Corner Task Force March 1994 Report. Comments by the Fairfax County Planning Staff were added to the report on March 7, 1994. The Task Force March 1994 Report along with staff comments is referred to herein as "the March 1994 Report." The March 1994 Report was transmitted to the Planning Commission and the Board of Supervisors by the Task Force and the Fairfax County Office of Comprehensive Planning on March 23, 1994. Pages 32-34 of the March 1994 Report contain the following proposed changes to the Comprehensive Plan:

*Gateways*

Gateways define the major approaches to an area or community. They are generally easily recognized and may be identified by a sign, a structure, or other symbol to clearly distinguish the entrance to an area. Gateways assist travelers to orient themselves and also help define limits to an area. Gateways function better if they are easily identified by a landmark, usually a well-remembered physical object or group of objects. Gateway landmarks are often one or a group of buildings. Landmarks are not necessarily buildings but can be a natural feature or special landscaping designed to create a gateway landmark.

Because Tysons Corner has a development character that is distinctively different from the surrounding residential areas, appropriate gateway features should be placed at the major approaches to the area. Individual buildings are the most common landmarks at the major gateways to Tysons Corner. For example,

the Tysons Sheraton Hotel is the western gateway landmark at the intersection of Route 7 and the DAAR. The Tycon Tower office building serves the same purpose at the southern gateway to Route 7 at I-495. The Tycon Courthouse office building is the landmark at the Route 123 gateway to Tysons Corner from the Town of Vienna. For minor gateways such as Gallows Road, appropriate landscaping and signage would be sufficient.

*Guidelines*

The visual prominence of gateway buildings should be enhanced as specified in the Land Unit Recommendations Section and on the Building Heights Map, Figure 8.

Where a tall building would be incompatible with adjacent land use, gateway landscaping and/or architectural features should be considered for gateway articulation. Gateway landscaping is a formal arrangement of plant materials that frames a major approach to an area. The plant materials should be chosen to be attractive in all seasons, including both evergreen and deciduous plants. Low maintenance materials should be selected for areas not likely to receive consistent maintenance or watering.

Consideration should be given to providing a cohesive system of signage beside roadways that indicate the traveler is entering Tysons Corner, much the way the Town of Vienna and the City of Falls Church have signs at their borders.

The March 1994 Report at page 104 addressed the subject property specifically. Certain building heights up to 150 feet were recommended for the parcel. The staff comments to page 104 noted:

For information purposes, it should be noted that the Task Force briefly considered establishing a gateway or landmark building within Sub-unit L-1 (the subject property) for a major corporate headquarters. However, at the time a relocation to Tysons Corner was not definite, and the Task Force thought that such a tall building should only be recommended upon a relocation becoming definite.

A Planning Commission workshop was held on March 23, 1994. At the workshop, the Planning Commission considered both the March 1994 Report and a staff report supplement dated March 23, 1994 ("the March

Supplement"). Because of the large volume of staff comments in the March 1994 Report, the Planning Commission asked the Task Force to meet again and consider those comments. The Task Force met again on March 29, 1994, and produced two documents. The first document accepted or rejected the staff comments. The second document addressed pages 34 and 104 of the March 1994 Report. It revised the proposed amendments to page 34 as italicized below:

> Because Tysons Corner has a development character that is distinctively different from the surrounding residential areas, appropriate gateway features should be placed at the major approaches to the area. Individual buildings are the most common landmarks at the major gateways to Tysons Corner. For example, the Tysons Sheraton Hotel is the western gateway landmark at the intersection of Route 7 and the DAAR. The Tycon Tower office building serves the same purpose at the southern gateway to Route 7 at I-495. The Tycon Courthouse office building is the landmark at the Route 123 gateway to Tysons corner from the Town of Vienna. *In addition to the existing gateway buildings, a northern gateway building(s) at the southwest corner of the Capital Beltway and DAAR Interchange could be considered if several of the Plan's major objectives are to be achieved, such as enhancing Tysons Corner as an employment and business center and creating an improved 'sense of place.* For minor gateways such as Gallows Road, appropriate landscaping and signage would be sufficient.

On March 29, 1994, the Task Force also modified the proposed changes to page 104 by adding the following language relating to building heights:

> *In this sub-unit, a northern gateway building at the southwest corner of the Capital Beltway and DAAR Interchange could be considered if several of the Plan's major objectives are to be achieved, such as enhancing Tysons corner as an employment and business center and creating an improved sense of place by establishing a major focal point within this sub-unit. The gateway's height should be greater than the adjacent area which has building heights of 150 feet.*

The above changes in language on pages 34 and 104 were provided to the Planning Commission in a Task Force Report supplement dated April 6, 1994 ("the April Supplement").

On April 6, 1994, the Planning Commission met. Its meeting had been publicly advertised as follows:

Notice is hereby given that the Fairfax County Planning Commission will hold a Public Hearing on Wednesday, April 6, 1994, at 8:15 p.m. in the Board Auditorium of the Government Center, 12000 Government Center Parkway, Fairfax, Virginia, to consider proposed revisions to the Adopted Comprehensive Plan for Fairfax County, Virginia, in accordance with Code of Virginia, Title 15.1, Chapter 11. This Comprehensive Plan Amendment (S93-CW-2CP) concerns land in the Tysons Corner Urban Center whose boundary is defined by the boundary used for the Tysons Corner Height Study, page 200 of the Area II volume of the 1991 Comprehensive Plan, as amended. This 1,700-acre area has been the subject of a special study conducted by the Tysons Corner Task Force and County staff to review the Plan for the Tysons Corner Urban Center. The recommendations of the Task Force and County Staff are contained in the report entitled "Draft Tysons Corner Urban Center Plan" and dated March 1994 (the March 1994 Report). This draft Plan contains recommendations for land use, transportation, environment, public facilities, heritage resources, and parks and recreation. The draft Plan will amend portions of the text for the McLean and Vienna Planning Districts contained in the Area II plan. The area is currently planned for commercial office and retail, industrial, and residential uses. The draft Plan generally retains these uses and provides for the consideration of other optional uses under certain conditions. Consideration will also be given to land use and transportation recommendations outlined in briefing materials provided to the Planning Commission on March 23, 1994. Copies of the Draft Tysons Corner Urban Center Plan may be obtained from the Office of Comprehensive Planning, 7th Floor, Community Development Center, 12055 Government Center Parkway, Fairfax, Virginia, two weeks prior to the Planning Commission hearing, persons desiring to speak on this amendment at the public hearing are requested to call 324-2865 to have their names placed on the speakers' list. March 16, 23, 1994.

The March 1994 Report, the March Supplement, and the April Supplement were before the Planning Commission at its April 6 meeting. Anyone attending the hearing that evening would have been given or would have had access to those documents. The issue of designating the subject property as a northern gateway for Tysons Corner was clearly and openly discussed at the meeting. The Planning Commission deferred its vote on the Comprehensive Plan amendment until April 27, 1994, at which time it approved the March 1994 Report as amended by the April Supplement, with some modifications. The version approved by the Planning Commission is known as the April 1994 Plan. The April 1994 Plan contains the page 34 amendments found in the April Supplement. The April 1994 Plan modified page 104 of the April Supplement so that height limits instead provided as italicized below:

> In this sub-unit, a northern gateway building(s) at the southwest corner of the Capital Beltway and the DAAR Interchange could be considered if several of the Plan's major objectives are to be achieved, such as enhancing Tysons Corner as an employment and business center and creating an improved sense of place by establishing a major focal point within this sub-unit. The gateway *building's* height should *not exceed 300 feet. Heights above 150 feet can be achieved if the result is more usable open space and preservation of environmentally sensitive areas, improved pedestrian circulation, and urban amenities.*

Amendments to the Comprehensive Plan were considered by the Board of Supervisors on June 6, 1994. A planning commission's decision is only a recommendation to the governing body, which makes the final and binding decision on amendments to a comprehensive plan. The public advertisement for the June 6, 1994, Board of Supervisors hearing was (in all respects relevant to this case) identical to the public advertisement for the April 6, 1995, Planning Commission hearing. That is, the advertisement referenced only the March 1994 Report and briefing materials provided to the Planning Commission on March 23, 1994. The Board of Supervisors deferred its vote on June 6, 1994, to June 27, 1994. Amendments to the Comprehensive Plan as reflected in the April 1994 Plan were adopted by the Board of Supervisors on June 27, 1994.

In addition to hearing presentations by Gannett and WEST*PARK, the Planning Commission and Board of Supervisors heard from a variety of citizens for and against the proposed amendments to the Comprehensive

Plan. Some of those speaking or submitting written comments against the amendments at both hearings included residents of McLean Hamlet or their designees.

On June 28, 1994, the day after approval of the amendments to the Comprehensive Plan by the Board of Supervisors, Gannett applied to Fairfax County for a special exception, and WEST*PARK applied for a proffered condition amendment. On October 26, 1994, the Planning Commission held a public hearing on the special exception application and the proffered condition amendment. Its vote was postponed until the following evening, and on October 27, 1994, both were approved. On October 31, 1994, the Board of Supervisors held a public hearing on the special exception and the proffered condition amendment and approved them. At both the October Planning Commission and Board of Supervisor hearings, a variety of citizens spoke for and against the proposals. Some of those speaking or submitting written comments against the proposals included residents of McLean Hamlet or their designees.

At trial, the Board of Supervisors moved to have the Court deem admitted its First Set of Requests for Admissions filed on March 17, 1995. Responses by the Petitioners to those requests were due on April 7, 1995. No response by the Petitioners was filed until April 20, 1995. Shortly before and after the Petitioners' responses were filed, counsel for the parties exchanged letters concerning the timing of the responses. Essentially, Petitioners requested that the Board of Supervisors agree to an extension of time for the filing of late responses, and the Board of Supervisors refused to do so. Petitioners never filed a motion with this Court for an extension of time or for the Court to accept the late responses as timely filed. Without question, it was incumbent upon Petitioners to request such relief. Absent an extension of time, its responses are late, and the Requests are deemed admitted under Rule 4:11(a) of the Rules of the Supreme Court of Virginia. At the same time, the Board of Supervisors made no motion before trial to have the Requests deemed admitted. Considering the nature of the Requests, the harm to Petitioners in having them deemed admitted, the lack of harm to the Board of Supervisors in allowing the late responses, and the best interests of justice, the Court denies the Board of Supervisors' motion and allows Petitioners' late responses as timely filed.

*Sufficiency of the Advertisement*
*of the Comprehensive Plan Amendments*

Section 15.1-431 of the Code of Virginia provides in pertinent part:

Plans or ordinances, or amendments thereof, recommended or adopted under the powers conferred by this chapter need not be advertised in full, but may be advertised by reference. Every such advertisement shall contain a descriptive summary of the proposed action and a reference to the place or places within the county or municipality where copies of the proposed plans, ordinances, or amendments may be examined.

The local commission shall not recommend nor the governing body adopt any plan, ordinance or amendment until notice of intention to do so has been published once a week for two successive weeks in some newspaper published or having general circulation in such county or municipality; however, such notice for both the local commission and the governing body may be published concurrently. Such notice shall specify the time and place of hearing at which persons affected may appear and present their views, not less than six days nor more than twenty-one days after the second advertisement appears in such newspaper. The local commission and governing body may hold a joint public hearing after public notice as set forth hereinabove. If such joint hearing is held, then public notice as set forth above need be given only by the governing body.

Section 15.1-431 is intended "to afford property owners who are closest to the land involved an opportunity to be heard . . . . Landowners abutting and across a road from the property involved are those most likely to be affected by the proposed change." *Lawrence Transfer & Storage Corp. v. Board of Zoning Appeals of Augusta County*, 229 Va. 568, 571 (1985) (involving zoning ordinance notice). By the notice "parties in interest and citizens must be apprised of the proposed changes to be acted upon so they can be present to state their views. It does not require that the notice contain an accurate forecast of the precise action which the [governing body] will take upon the subjects mentioned in the notice of hearing." *Ciaffone v. Community Shopping Corp.*, 195 Va. 41, 50 (1953) (construing a similar statute since repealed). After the public hearing with notice as required by § 15.1-431, the Board of Supervisors may approve and adopt, disapprove, or amend and adopt the comprehensive plan certified to it by the Planning Commission. § 15.1-450. Thus, the language adopted by the Board of Supervisors may be a modification of the language approved by the Planning Commission as long as it addresses the same subject matter.

McLean Hamlet contends that it was denied notice and comment under § 15.1-431 on three occasions. First, it asserts that the October 31, 1994, Board hearing approving the special exception and proffered condition amendment took place one business day after the Planning Commission voted to recommend approval of those applications. Petitioners claim this "drastically short notice for the Board's hearing gave no meaningful opportunity for comments by interested Petitioners and members of the public." Petitioners' Brief at page 14. Section 15.1-431 allows the Planning Commission and the Board of Supervisors to hold a joint public hearing with both bodies voting on the same occasion. If a joint public hearing could be held, with a vote by both bodies on the same occasion, then holding the Board of Supervisors hearing three calendar days (one business day) after the Planning Commission hearing in this case does not violate a citizen's right to notice and comment.

Petitioners' second and third claims of inadequate notice are interrelated. McLean Hamlet asserts that notice of the April 6, 1994, Planning Commission hearing was inadequate because the public notices referred only to the March 1994 Report and to March 23, 1994, briefing materials. Petitioners contend that those documents did not refer to a potential "gateway" designation for or to changes in height restrictions on the subject property. Those issues were addressed in the April Supplement, but that document was not referenced in the public notice (and could not have been because it was not yet in existence). Third, McLean Hamlet contends that notice of the June 6, 1994, Board of Supervisors public hearing was deficient because the notice referred only to the March 1994 Plan and the March 23, 1994, briefing materials. The notice made no reference to the April Supplement or the April 1994 Plan as approved by the Planning Commission. As a result, McLean Hamlet asserts that the notice of the June 6, 1994, Board hearing failed to reference a potential gateway designation for the subject property specifically, notwithstanding that such was clearly part of the Planning Commission's recommendations (which did exist at the time and could have been included in the public notice of the June 6 hearing).

The Board of Supervisors amended and then adopted language presented to it by the Planning Commission without readvertising; this is allowed by § 15.1-450. The more difficult issue before this Court is whether the advertisement of the hearings sufficiently informed the public of proposed action regarding the property so as to place a reasonable, interested citizen on notice and inquiry.

The defendants assert that this requirement was met in a variety of ways. First, they contend that anyone attending the April 6, 1994, Planning Commission hearing would have been provided with a copy of the April Supplement at the time of the hearing. They further assert that anyone attending the June 6, 1994, Board hearing would have been provided with a copy of the April Supplement and the April 1994 Plan. The Court finds those assertions to be factually true and further finds that such documents would clearly have placed a citizen on notice of the action ultimately taken by those bodies. But the issue is not whether those documents sufficiently inform the public, since they were not mentioned in either advertisement. The issue is whether the documents referenced in the public advertisements for those hearings, if reviewed by a reasonable citizen, would have placed that citizen on notice of the types of changes in the comprehensive plan ultimately adopted by the Board and would have triggered in him an interest in or need for review of those additional documents.

Defendants also claim that the notice requirement was satisfied because the following language appeared in the March 1994 Report:

> For information purposes, it should be noted that the Task Force briefly considered a gateway or landmark building within Subunit L-1 for a major corporate headquarters. However, at the time a relocation to Tysons Corner was not definite, and the Task Force thought that such a tall building should only be recommended upon a relocation becoming definite.

Defendants contend that this language places a reasonable citizen on notice that an amendment to the Comprehensive Plan allowing the subject property to be termed a gateway in the future under certain circumstances would be considered.

The purpose of advertising amendments to a comprehensive plan is not to offer a prediction or guarantee of precise action that will be taken. Rather, it is to inform a reasonable citizen of the subject at issue and to suggest parameters of action to be considered. When that is done, it is the citizen's responsibility to make his voice heard. If he fails to do so, he may not later complain. But the action ultimately taken by a governing body must have been foreseeable based on the advertisement. The passage of general measures in a comprehensive plan requires but a general advertisement of those or similar measures. But the more specific the measures, the more specific the advertisement must be. It is not sufficient to advertise

general measures applicable to a variety of property and then pass very specific ones applicable only to one parcel without further notice.

The Court finds that the general language regarding gateways contained in the March 1994 Report and thereby advertised to the public did not sufficiently alert the public that very specific language relative to the subject property as a gateway would be made part of the Comprehensive Plan. The Court therefore holds that the portions of the Comprehensive Plan amendments adopted by the Board of Supervisors in June 1994 that were referenced in the March 1994 Report and hence sufficiently advertised are valid. But the amendments adopted that were specific to the subject property were insufficiently advertised and are not valid. The actions of the Board of Supervisors in approving the special exceptions and proffered condition amendment in October 1994 must be judged against the 1994 Comprehensive Plan amendments that the Court finds to be valid. Those amendments are found in the language of the March 1994 Report quoted above and are referred to hereafter as "the valid 1994 amendments." The Court also will examine those approvals in light of the 1992 Comprehensive Plan in the event that all the 1994 Comprehensive Plan amendments are held invalid.

### Correctness of the Board's Approvals

The approvals of the special exception and the proffered condition amendment by the Board of Supervisors carry with them a presumption of reasonableness. *Byrum v. Orange County*, 217 Va. 37, 40 (1976); *County Board of Arlington County v. Bratick*, 237 Va. 221, 227 (1989). The presumption is a rebuttable one. Petitioners must put on probative evidence that the Board of Supervisors' decisions were unreasonable. In that event, the burden shifts to the governing body to produce evidence of reasonableness. *County of Lancaster v. Cowardin*, 239 Va. 522, 526 (1990). This Court may not substitute its judgment for that of the governing body. *Byrum*, 217 Va. at 39. If the Court finds the issue to be fairly debatable, it must uphold the Board's decision. *Fairfax County v. Parker*, 186 Va. 675, 680 (1947). An issue is fairly debatable when the evidence offered in support of the opposing views would lead objective and reasonable persons to different conclusions. *Ames v. Town of Painter*, 239 Va. 343, 348 (1990). A court may overturn the decision of the governing body only if that decision is arbitrary, capricious, or unreasonable. *Bratick*, 237 Va. at 227; *Board of Supervisors of Fairfax County v. Jackson*, 221 Va. 328, 334-35 (1980). In determining whether a governing body's decision was arbitrary, capricious, or unreasonable or not fairly debatable, this Court

must look to what a governing body could have known at that time it acted. *Industrial Development Authority v. LaFrance Cleaners & Laundry Corp.*, 216 Va. 277, 282 (1975).

Petitioners assert that the designation of the subject property as a gateway was key to approval of the project. The court agrees. That designation was accomplished by the October 1994 approval of the special exception. The Court must first look to whether designation of the subject property as a gateway was, in principle, consistent with the valid 1994 amendments to the Comprehensive Plan. Alternatively, in the event even those limited amendments were invalid, was designation of the subject property as a gateway allowable under the 1992 Comprehensive Plan?

The prospect of the designation of the subject property as a gateway was clear to any citizen reading the March 1992 Comprehensive Plan or the valid 1994 amendments. The March 1992 Plan provides that because the development characteristics of the Tysons Corner area are so different from surrounding residential areas, appropriate gateways can be placed at major entrances to the area. The purpose of those gateways is "to announce the entering or leaving of the area and change of characters for viewers on high speed paths such as I-495 and the DAAR." March 1992 Comprehensive Plan at page 201. Despite the testimony of Petitioners' expert witness to the contrary, the Court finds that the subject parcel is clearly located at a "major entrance" to the Tysons Corner area. It is precisely at the intersection of I-495 and the DAAR and is the Tysons Corner parcel first encountered by vehicles north of Tysons Corner traveling south on I-495. The Court rejects Petitioners' claim that a "major entrance" to the Tysons Corner area for gateway purposes must include at that very spot an exit from I-495 or the DAAR. That is a misreading of the gateway concept. The concept is that departure from one area and arrival at the Tysons Corner area are announced by the gateway feature. That the exit to the Tysons Corner area follows soon after rather than precisely at the gateway makes it no less a gateway.

It is also apparent that the nature of the gateway under the March 1992 Plan depends upon the speed of approaching traffic. On Routes 7 and 123, where the speed limit is lower, landscaping and signing may be sufficient to make the gateway announcement, and hence, may be appropriate. But for high speed paths such as I-495 and the DAAR, "[o]ne or a group of significant buildings could be used for this purpose." March 1992 Comprehensive Plan at 201.

Under the valid 1994 amendments, gateways remain recognizable structures, signs, or symbols orienting travelers and announcing arrival at and departure from the Tysons Corner area. The valid 1994 amendments provide that "[b]ecause Tysons Corner has a development character that is distinctively different from the surrounding residential areas, appropriate gateway features should be placed at the major approaches to the area. Individual buildings are the most common landmarks at the major gateways to Tysons Corner." April 1994 Plan at page 32-34. As examples, the amendment lists three tall buildings which constitute the western and southern gateways to Tysons Corner and the gateway along a major artery from the Town of Vienna. Again, the amendments suggest that for gateways along more minor roadways, landscaping and signage would be sufficient.

The subject property is clearly a "major approach to the area." Under the 1992 Comprehensive Plan, it *can* be considered for gateway status. Under the 1994 valid amendments, it *should* be.

This Court finds that a reasonable citizen reading either the March 1992 Comprehensive Plan or the valid 1994 amendments would realize that, upon proper notice, the subject parcel could be considered for gateway status. Notice was given when the gateway designation was requested in the special exception for the subject parcel properly advertised for hearing in October 1994.

The evidence presented to the Board of Supervisors and before the Court in connection with the special exception and proffered condition amendment was voluminous on behalf of both sides. To summarize it invites doing it an injustice. The parties should know that the Court has reviewed and considered all that evidence at length.

At trial, a landscape architect testified on behalf of Petitioners that the visual impact analysis he performed showed a significant adverse impact of the project on McLean Hamlet. An architect and planner testified that the project would have an adverse visual effect on the community; that the County mistakenly used a fourteen degree view angle as a yardstick in considering line-of-sight issues in a suburban setting; and that the County failed to consider many factors other than the height of buildings to determine the visual effect of the project. Various residents and Task Force members related the testimony they gave or submitted at the Planning Commission and Board of Supervisors hearings, the adverse impact of the project on their community, and the results of balloon studies and mock helicopter landings undertaken by Gannett and WEST*PARK. An audi-

ologist testified that the noise studies undertaken by a WEST\*PARK and Gannett audiologist were inadequate because the quantity and nature of the data available was insufficient. A land use and planning expert for Petitioners testified that the October 1994 Board of Supervisors decisions were inconsistent with the 1994 Comprehensive Plan amendments; that the Fairfax County staff lacked sufficient information from the applicants to undertake any meaningful analysis; and that it was rare (and inappropriate) for the Planning Commission and the Board of Supervisors to amend the comprehensive plan in a manner different from the advertised amendments. Rather, he testified that readvertisement should have been required for the amendments to have been passed. McLean Hamlet also presented a video showing potential effects of the project on their community.

The Court finds that the evidence submitted by the Petitioners was more than ample to rebut the presumption of reasonableness of the decisions of the Board of Supervisors and that therefore, the burden shifted to the governing body to produce evidence of reasonableness.

On behalf of the Defendants, an architect testified that the visual impact of the project on McLean Hamlet would be modest. The executive director of the Fairfax County Economic Development Authority testified to the economic benefit of the project for the County. An acoustical consultant testified that there would be little environmental and acoustical impact resulting from the project, that the information available to the Defendants' acoustical expert for the analysis that was done was sufficient and that there would be no significant noise impact on McLean Hamlet from the use of helicopters on the project. The director of the Fairfax County Office of Comprehensive Planning testified that the project was consistent with both the 1994 Comprehensive Plan amendments and the 1992 Comprehensive Plan. A real estate appraiser testified that there would be no adverse economic impact on the land values in McLean Hamlet as a result of the project. The Defendants also introduced the evidence presented to the Planning Commission and the Board of Supervisors. Verbatim excerpts of the Planning Commission and Board of Supervisors hearings were also introduced.

The issue before the Court is not whether the Court would have reached the same decision as did the Board of Supervisors. Based on the evidence before it, the Court finds that the Defendants produced sufficient evidence to demonstrate that the approvals by the Board of Supervisors of the special exception application and proffered condition amendment were not

arbitrary, capricious, or unreasonable and instead were fairly debatable. The Court finds that those approvals were consistent with the valid 1994 amendments. The Court further finds that even if the 1994 amendments found here to be valid were invalid, the approvals were consistent with the 1992 Comprehensive Plan. The approvals did not violate existing zoning ordinances and were not illegal. They did not constitute illegal spot zoning as they further the welfare of the entire County as part of an overall plan in addition to benefitting private interests. *See Wilhelm v. Morgan*, 208 Va. 398, 403-404 (1967).

For the reasons contained in this opinion letter, the approvals by the Board of Supervisors in October 1994 of Gannett's special exception application and WEST*PARK's proffered condition amendment are upheld, and McLean Hamlet's Petition is dismissed.