# CIRCUIT COURT OF WARREN COUNTY

Riverton Investment Corp. et al.

v.

Economic Development Authority

November 17, 1999

Case No. (Chancery) 99-220

BY JUDGE JOHN E. WETSEL, JR.

This case came to be heard on November 15, 1999, on the Plaintiffs' Verified Petition for a Temporary Injunction. Sean F. Murphy, Esquire, appeared for the Plaintiffs; and Douglas W. Napier, Esquire, the Warren County Attorney, appeared for the Defendant.

Thereupon, Thomas M. Lawson and Ann K. Crenshaw, Esquires, appeared for Carolina Cement Company, t/a Roanoke Cement Company, and filed a Motion to Intervene and Objections to the Complainants' Motion for an Injunction. Upon consideration whereof, it is adjudged and ordered that the Motion to Intervene is granted and Carolina Cement Company, t/a Roanoke Cement Company, is joined as a party defendant to this suit.

Thereupon, argument was heard on the Plaintiffs' Motion for a Temporary Injunction.

## I. *Statement of Material Facts*

The following material facts are not in dispute.

On November 12, 1999, the Economic Development Authority of the Town of Front Royal and the County of Warren, Virginia, (the "EDA") voted to sell a lot, which it owns in the Kelly Industrial Park in Warren County, to Roanoke Cement Company. The minutes of that meeting recite that the "sale ... is in accordance with the purposes of industrial development authorities set forth by the General Assembly ... and is for the benefit of the inhabitants of the Commonwealth ... through the increase of their commerce or through the promotion of their ... prosperity." Minutes, pp. 2-3.

While Roanoke Cement Company has other facilities in Virginia, it is new to Warren County, and it plans to build a bulk storage facility on the EDA lot on which it will store and distribute cement in bulk.

Riverton, which for a long time has had a facility in Warren County, is a competitor of Roanoke Cement, and paragraph 47 of the Bill of Complaint avers that:

> The proposed sale will ... confer upon Roanoke a competitive advantage to the significant detriment of Riverton without any corresponding benefit to the inhabitants of the Commonwealth ... .

The Plaintiffs Frittses live near, but not adjacent to, the lot which is proposed to be sold to Roanoke Cement, which is about 2000 feet from their property. The Frittses claim that traffic will be increased on Rockland Road, which is a public road, by the Roanoke Cement facility. While the Frittses do not live on Rockland Road, they must use Rockland Road to get to the residential subdivision in which they live. The Frittses also claim that they will be able to see the Roanoke Cement facility when it is constructed.

## II. *Conclusions of Law*

Authorities like the Economic Development Authority are a political subdivision of the Commonwealth created pursuant to the Industrial Development and Revenue Act. See *Lexington v. Rockbridge I.D.A.*, 221 Va. 865, 871, 275 S.E.2d 888 (1981). As a public authority, the Economic Development Authority is a limited purpose, public corporation, and it has only those powers conferred upon it by the General Assembly. *See Vepco v. Hampton Redev. & Housing Auth.*, 217 Va. 30, 225 S.E.2d 364 (1976). Authorities created under the Industrial Development and Revenue Act are specifically granted the power "to sell ... any or all of its ... properties whenever its board shall find any such action to be in furtherance of the purposes for which the authority was organized." Accordingly, in this case the

plaintiffs do not claim that the authority lacked the power to sell the land in question, but rather their first argument is that the transaction does not accomplish the stated purposes of the Act and is in essence an *ultra vires* act.

The stated purpose of the Industrial Development and Revenue Bond Act is:

> [T]o authorize the creation of industrial development authorities by the localities in this Commonwealth so that such authorities may acquire, own, lease, and dispose of properties and make loans to the end that such authorities may be able to promote industry and develop trade by inducing manufacturing, industrial, governmental, nonprofit and commercial enterprises and institutions of higher education to locate in or remain in this Commonwealth … .

Virginia Code § 15.2-4901. The Act "is designed to induce new industries to locate in 'or remain in' the Commonwealth." *I.D.A. v. La France Cleaners*, 216 Va. 277, 280, 217 S.E.2d 879 (1975).

The warehousing and distribution facility which Roanoke Cement proposed to build on the lot is an "enterprise" within the purview of the Act. Virginia Code § 15.2-4902. However, the plaintiffs argue that since Roanoke Cement already has extensive facilities in Virginia in Roanoke, Bristol, Chesapeake, and Richmond, it is already in the Commonwealth; therefore, it does not qualify as an industry being induced by the Authority's action "to locate in … this Commonwealth." Plaintiffs' Memorandum, p. 3. Roanoke Cement Company's proposed facility is new industrial enterprise in Warren County, so it is new to the Commonwealth, and the authority's sale of the lot may be one of the inducements which results in Roanoke Cement's actually building its new facility in Warren County, which the EDA found will increase commerce in the Commonwealth. See Official Minutes, pp. 2-3.

*Lexington v. I.D.A. of Rockbridge*, 221 Va. 865, 275 S.E.2d 888 (1981), relied upon by the Plaintiffs is an instructive case. In the phrase parsing frenzy that seems to characterize these cases, the issue in that case was whether a retail facility like K-Mart was a "commercial enterprise" within the purview of the Act; both the trial court and the Supreme Court ruled that it was, and the Rockbridge County Industrial Revenue Authority was permitted to issue bonds under the Industrial Development and Revenue Bond Act for the purpose of constructing the K-Mart, which the City of Lexington opposed. At that time, K-Mart was not just entering Virginia, there were numerous K-Marts in Virginia, such as in Roanoke and Charlottesville, to name but two of

the many that were then in the Commonwealth. In upholding the issuance of the bonds, the Supreme Court stated:

> To determine the "public purpose" of the Act we refer again to Code § 15.1-1375 [now § 15.2-4902]. There, the General Assembly stated that its intent in creating authorities was to promote industry and to develop trade by inducing commercial enterprises to locate and remain in Virginia and to further the use of the state's agricultural products and natural resources. The legislature vested the Authority with all powers necessary to accomplish this purpose with the admonition that the powers are to be exercised for the benefit of the inhabitants of the state through increase of the state's commerce or through the promotion of safety, health, welfare, convenience, and prosperity. Significantly, it further directed that the Act should be liberally construed to promote these expressed intentions.
>
> *We must give the Act a rational construction consistent with its purposes and not one which will substantially defeat its objectives. Norfolk So. Ry. Co. v. Lassiter*, 193 Va. 360, 68 S.E.2d 641 (1952). The Act was designed to stimulate the economy of Virginia, thereby providing jobs, increasing business activity, and broadening the state's tax base.

*Id.* at 869 (emphasis added).

In considering whether a proposed new enterprise accomplishes the purposes of the Act, courts "are directed to construe the Act liberally, to the end that its stated purposes be accomplished." *Id.* at 870. The Act must be given "a rational construction consistent with its purposes and not one that will substantially defeat its objectives." *Id.* at 869. To construe the Act to mean that a business which already had facilities in Virginia was beyond the purview of the Act, would mean that an authority created under the Act would be precluded from trying to induce many, if not most, of the Fortune 500 companies from locating anywhere else in Virginia, because they already have facilities in Virginia. Such a narrow construction would thwart the basic objectives of the statute, which are clearly designed to enable localities to induce new industrial and commercial enterprises to locate in Virginia. The analysis under the Act with respect to a proposed new business is really very simple. If the proposed enterprise, such as Roanoke Cement's new bulk storage facility in this case, is new to the Commonwealth, then that particular facility or enterprise is a new industry in the Commonwealth, and the industrial development authority may take such actions as are authorized

under the statute to induce the business in question to bring to fruition the proposed facility in Virginia, and the courts are not to second guess those decisions and actions.

The Industrial Development and Revenue Act does not provide for judicial review of the actions of the authority, nor is the authority subject to the Virginia Administrative Process Act. Virginia Code §§ 9-6.14.1 *et seq.* Local authorities are expressly exempted from the Administrative Process Act's coverage. Virginia Code § 9-6.14:4.1(5). Accordingly, the complaint is subject to the very circumscribed judicial power to review legislative acts and discretionary governmental action. As the Supreme Court noted in *Ames v. Town of Painter,* 239 Va. 343, 349, 389 S.E.2d 702 (1990) (review of special use permit): "Judicial review of legislative acts must be approached with particular circumspection because of the principle of separation of powers, embedded in the Constitution." Therefore, assuming without deciding that the Plaintiffs have standing to maintain this suit, "[I]t must be kept in mind that the courts cannot set aside ordinances [or legislative actions of the Authority] unless they are unconstitutional, *ultra vires,* or under certain circumstances, unreasonable." 56 Am. Jur. 2d, *Municipal Corporations,* § 386.

As stated in 42 Am. Jur. 2d, *Injunctions,* § 175.

> As a general rule, equity does not undertake the revision or supervision of governmental action lawfully exercised through the legislative, or executive or administrative, departments of the government. It will not interfere by injunctions with the duties of any department except under special circumstances and when necessary to protection of property or other rights against irreparable injury ... .
>
> The courts cannot by injunctive process control or direct a head of an executive department in the discharge of any constitutional duty involving the exercise of judgment or discretion. The prevention of irreparable harm and of a multiplicity of suits cannot be invoked as grounds for equitable relief in such cases.

The Plaintiffs' second argument is that the EDA's actions in selling the land to Roanoke Cement were arbitrary and capricious. To some extent, the arbitrary and capricious world is a netherworld whose boundaries are fixed by the subjective values and perspectives of the viewer; consequently, it is a dangerous place for courts to enter, because of the intellectual risk that the court, upon hearing the arguments of the contending parties, may substitute its view for that of the legislative body or board, which was initially given the prerogative to act on the issue. Actions are legally characterized as arbitrary

and capricious when they are "taken without consideration or in disregard of facts or law or without determining principle." *School Bd. of the City of Norfolk v. Wescott*, 254 Va. 218, 494 S.E.2d 146 (1997), *quoting Black's Law Dictionary*, p. 105 (6th ed. 1990). Given the nebulous perimeters of the concept, legislative actions are presumed to be reasonable and will be upheld if the premise supporting the action was fairly debatable, another abstraction which simply means that there was some evidence supporting the action. *See I.D.A. v. LaFrance Cleaners*, 216 Va. 277, 281, 217 S.E.2d 879 (1975) (the presence of "any credible evidence" will justify the action); *Fairfax County v. Southland Corp.*, 224 Va. 514, 523, 297 S.E.2d 718 (1982) ("some evidence of reasonableness" to support the zoning ordinance); and *Helmick v. Town of Warrenton*, 254 Va. 225, 231 (1997) (allegations in pleadings did not support conclusion that action was arbitrary; "motives of the governing body in undertaking the act are immaterial").

In *Bristol Redevel. & Housing Auth. v. Denton*, 198 Va. 171, 176-77, 93 S.E.2d 288 (1956), the Supreme Court affirmed the trial court's decision enjoining a municipal slum clearing project on the ground that the authority's determination that the area to be razed was a slum was arbitrary and capricious, and in doing so, the Supreme Court reviewed the principles governing such judicial review of a claim of arbitrary and capricious action by an authority:

> It is of course well settled, as the appellants argue, that "Since the determination of questions of fact on which the constitutionality of statutes may depend is primarily for the legislature, the general rule is that the courts will acquiesce in the legislative decision unless it is clearly erroneous, arbitrary, or wholly unwarranted." 11 Am. Jur., *Constitutional Law*, § 144, p. 823. Or, as another authority states it, "The determination of the ... facts on which the validity of a statute depends is primarily for the legislature," subject to review usually only where "manifestly arbitrary or unreasonable." 16 C.J.S., *Constitutional Law*, § 151(3), p. 763. See also, 4 Mich. Jur., *Constitutional Law*, § 55, pp. 145, 146. If the question "is fairly debatable and the legislative determination is not manifestly arbitrary or unreasonable," it must be sustained. 16 C.J.S., *Constitutional Law*, § 151(3), pp. 763, 764. See also, *Reynolds v. Milk Commission*, 163 Va. 957, 967, 179 S.E. 507, 510; *Mumpower v. Housing Authority*, 176 Va. 426, 443, 11 S.E.2d 732, 738.

> On the other hand, legislative conclusions based on findings of fact are not immune from judicial review where they are arbitrary and

unwarranted. 16 C.J.S., *Constitutional Law*, § 151(3), p. 764. These principles apply with respect to the legislative acts of municipal corporations. McQuillin on Municipal Corporations, 3d ed., vol. 2, § 10.33, p. 653 ff; *Id.*, § 10.37, p. 663 ff; *National Linen Service Corp. v. City of Norfolk*, 196 Va. 277, 279, 83 S.E.2d 401, 403, and cases there cited ... .

All presumptions are in favor of the validity of the exercise of municipal power. *National Linen Service Corp. v. City of Norfolk, supra*, 196 Va., at p. 279, 83 S.E.2d, at p. 403, and cases there cited; 62 C.J.S., *Municipal Corporations*, § 208-a, p. 389 ff; 37 Am. Jur., *Municipal Corporations*, § 177, p. 810 ff. The burden is upon one alleging the invalidity of an ordinance to establish such invalidity by clear and convincing proof. 62 C.J.S., *Municipal Corporations*, § 208-c, p. 395; 37 Am. Jur., *Municipal Corporations*, § 179, pp. 814, 815.

In *Jamerson v. Womack*, 244 Va. 506, 509-10, 423 S.E.2d 180 (1992) (judicial review of 1991 voting reapportionment act), the Supreme Court noted that:

[I]t is also settled that if the validity of such a [legislative] determination is fairly debatable, the legislative determination will be upheld by the courts. *Barrick v. Board of Supervisors*, 239 Va. 628, 630, 391 S.E.2d 318, 319 (1990) (adoption of zoning ordinance). In this context, an issue is "fairly debatable" if, "when, measured by both quantitative and qualitative tests, the evidence offered in support of the opposing views would lead objective and reasonable persons to reach different conclusions." *Board of Supervisors v. Jackson*, 221 Va. 328, 333, 269 S.E.2d 381, 384-85 (1980) (denial of rezoning by board of supervisors).

Further, we also note the "strong presumption of validity" attached to every statute and the requirement that it "clearly" violate some constitutional provision before courts will invalidate it. *Caldwell v. Seaboard System R.R.*, 238 Va. 148, 152, 380 S.E.2d 910, 912 (1989). Thus, courts "have nothing to do with the question whether or not legislation is wise and proper"; only where the statute in issue is "plainly repugnant" to a constitutional provision will we declare it null and void. *City of Charlottesville v. DeHaan*, 228 Va. 578, 583-84, 323 S.E.2d 131, 133 (1984) (quoting *Ex parte Settle*, 114 Va. 715, 719, 77 S.E. 496, 497 (1913)).

The Plaintiffs' second argument is premised on the claim that the EDA violated its own internally promulgated rules for the use and development of the land in the Kelly Industrial Park when it decided to sell the land to Roanoke Cement, so that action was arbitrary and capricious. The rules in question are not restrictive covenants, but rather are guidelines which the authority itself promulgated to assist it in its operations; consequently, these rules are subject to amendment at any time. As a matter of substantive law, a municipal corporation may amend its rules or governing ordinances at any time, and in fact it cannot promulgate a nonrepealable or unamendable rule or ordinance. *See generally* 56 Am. Jur. 2d, *Municipal Corporations,* § 410. The Authority's development guidelines were just that, they were development guidelines promulgated by a majority vote of the board of the Authority, so they could be changed at any time by a majority vote of the authority's board, as was done in this case. While the sale may benefit Roanoke Cement, the Authority's action would not constitute special legislation. *See Industrial Devel. Auth. v. Suthers,* 208 Va. 51, 155 S.E.2d 326 (1967) (bond issuance may benefit private party, but it is done pursuant to powers that confer benefits on the inhabitants of the Commonwealth).

Competitors like Riverton frequently oppose the actions of economic development authorities on the ground that the new facilities may hurt local business. *See, e.g. I.D.A. v. La France Cleaners,* 216 Va. 277, 281, 217 S.E.2d 879, 883 (1975). While competition with local businesses may be a proper consideration for the Authority, it does not control its decision. It is not unlikely that some of the small merchants in Lexington may have been adversely affected by K-Mart's locating in Rockbridge County, but the impact on local businesses is simply one factor that the authority may consider in its decision.

In considering whether to issue a temporary injunction, courts generally consider (1) the plaintiffs' likelihood of success on the merits; (2) the likelihood of irreparable harm to the plaintiffs if the temporary injunction is denied; (3) the likelihood of harm to the defendants if the requested relief is granted; and (4) the public interest. *See Christian Defense Fund v. Stephen Winchell & Assocs., Inc.,* 47 Va. Cir. 148 (Fairfax 1998), applying the federal injunction standard of *Rum Creek Coal Sales, Inc. v. Caperton,* 926 F.2d 353 (4th Cir. 1991).

As stated in 42 Am. Jur. 2d, *Injunctions,* § 179:

> Persons or corporations seeking to restrain the acts of public officials or corporations must have sufficient title or interest to enable them to maintain the suit ... . If a mere public right is to be vindicated ... the

action should be brought by the attorney general ... or some public officer or body especially charged with enforcing the law ... . [O]rdinarily ... private citizens or corporations must possess something more than a common concern for obedience to the law before they will be permitted to maintain injunction suits against public officers. A private person who wishes to restrain an official must allege and prove damage to himself different in character from that sustained by the public generally.

Some prospect of damage different from that of the public at large must be present in order to have standing to maintain a suit for an injunction against public officials. Traffic on a public road like Rockland Road would be increased by nearly any facility which would be built in the Kelly Industrial Park, and any business facility which may be constructed on the lot would be visible not only to the Frittses but to the public in general. Riverton is subject to competition in the free market every day; so, absent an unfair trade allegation, there is no legally cognizable, potential irreparable harm to Riverton. Competition is the hallmark of the free market system, and courts do not generally issue injunctions against indirect damage by lawful competition. "Competition in business, even though carried to the extent of ruining a rival, constitutes justifiable interference with another's business relations and is not actionable so long as the methods employed are lawful and the dominant purpose is not to inflict harm, and under such circumstances an injunction will not issue." 42 Am. Jur. 2d, *Injunctions*, § 75.

Without proof of damage particular to them of an irreparable character, the plaintiffs' standing to maintain this action is called into question. "[I]t is well settled that one who is not injured by the operation or effect of a municipal ordinance or is not within its purview cannot raise questions as to its validity, such as its constitutionality or unreasonableness." 56 Am. Jur. 2d, *Municipal Corporations*, § 379. Accordingly, considering the governing law and the allegations of the bill of complaint as supplemented during the argument, the requirements for the issuance of a temporary injunction have not been met in this case.

## III. *Decision*

For the foregoing reasons, it is adjudged and ordered that the Plaintiffs' petition for a temporary injunction is denied [and] this case is continued.