JUSTICE KELSEY, dissenting.
 

 Virginia law authorizes natural gas companies, as defined by 15 U.S.C. § 717a(6), to enter onto private property for such surveys "as are
 
 necessary
 
 (i) to satisfy any regulatory requirements
 
 and
 
 (ii) for the selection of the most advantageous location or route, the improvement or straightening of its line or works, changes of location or construction, or providing additional facilities." Code § 56-49.01(A) (emphases added).
 

 The first "necessary" precondition is that the company has to enter onto the private property to comply with legal requirements. The second "necessary" precondition is that the company wants to enter onto the private property to decide whether it will later take the property using the power of eminent domain. This conjunctive has-to/wants-to test delicately balances the rights of private property owners against the public's interest in efficient and reliable energy infrastructure.
 

 Agreeing with Atlantic Coast Pipeline, LLC ("ACP"), the majority holds that "and" means "or" in Code § 56-49.01(A) and thus concludes that satisfying precondition (ii) renders it unnecessary to satisfy precondition (i). After making this emendation, the majority concludes: "As it is undisputed that ACP meets the definition of a natural gas company under 15 U.S.C. § 717a, the General Assembly has extended the privilege to enter land in the possession of another, provided that such entry falls within the scope of the authority granted by the legislature."
 
 Ante
 
 at 788. In plain speech, this statement means that it is sufficient that an out-of-state pipeline company
 
 wants to
 
 enter onto private property against a landowner's will (to determine whether to take the property) even though it does not
 
 have to
 
 do so in order to satisfy regulatory requirements. Under this view, it does not matter that the pipeline company has never been granted a federal permit to build the pipeline or even that the company has never applied for one. All that matters is that the pipeline company qualifies as a natural gas company under 15 U.S.C. § 717a(6) and wants to enter the private property to figure out whether to one day build a pipeline across it.
 

 All of this reasoning, as well as its conclusion, collapses if "and" means "and." I think that it does. According to the plain meaning of the statute, ACP must satisfy both preconditions before it may lawfully conduct a physical survey on private property against a landowner's will. Because ACP could not prove at the time that the circuit court ruled that entering private property against the landowner's will was "
 
 necessary
 
 ... to satisfy any regulatory
 
 requirements
 
 ," Code § 56-49.01(A) (emphases added), I dissent from the majority's reasoning and result.
 
 [1]
 

 I.
 

 As a general rule, one cannot unlawfully enter real property against a landowner's will. For centuries, the law has deemed such action a trespass and has subjected the trespasser to civil, and sometimes criminal, liability. Anglo-American law has an unbroken record of treating private property ownership as a fundamental right, one that serves as a pillar upon which many, if not most, other rights depend. "This view presupposes that an essential 'interdependence exists between the personal right to liberty and the personal right in property. Neither could have meaning without the other.' "
 
 AGCS Marine Ins. v. Arlington Cty.
 
 ,
 
 293 Va. 469
 
 , 476,
 
 800 S.E.2d 159
 
 , 163 (2017) (quoting
 
 Lynch v. Household Fin. Corp.
 
 ,
 
 405 U.S. 538
 
 , 552,
 
 92 S.Ct. 1113
 
 ,
 
 31 L.Ed.2d 424
 
 (1972) ). The Virginia Constitution reaffirms this ancient belief.
 
 See
 
 Va. Const. art. I, § 1 (listing "the means of acquiring and possessing property" as an "inherent" right);
 

 id.
 

 § 11 (declaring "private property" to be a "fundamental" right);
 
 see also
 
 Code § 1-219.1(A) (same).
 

 One of the core features of private property rights at common law was the right to keep property
 
 private
 
 -which necessarily embraces the right to exclude the
 
 public
 
 . As Blackstone explained, private property is "that sole and despotic dominion which one man claims and exercises over the external things of the world, in total exclusion of the right of any other individual in the universe." 2 William Blackstone, Commentaries *2. James Madison similarly saw the power of "exclusion of every other individual" as the core feature of the right to private property. James Madison,
 
 Property
 
 , Nat'l Gazette, Mar. 29, 1792,
 
 reprinted in
 
 1 The Founders' Constitution 598, 598 (Philip B. Kurland & Ralph Lerner eds., 1987).
 

 We recently expressed our unanimous agreement with this view, reaffirming that, in Virginia, "the right to exclude others is generally 'one of the most essential sticks in the bundle of rights that are commonly characterized as property.' "
 
 Palmer v. Atlantic Coast Pipeline, LLC
 
 ,
 
 293 Va. 573
 
 , 581,
 
 801 S.E.2d 414
 
 , 418 (2017) (alteration omitted) (quoting
 
 Ruckelshaus v. Monsanto Co.
 
 ,
 
 467 U.S. 986
 
 , 1011,
 
 104 S.Ct. 2862
 
 ,
 
 81 L.Ed.2d 815
 
 (1984) );
 
 see also
 

 Byrd v. United States
 
 , 584 U.S. ----, ----,
 
 138 S.Ct. 1518
 
 , 1527,
 
 200 L.Ed.2d 805
 
 (2018) ("One of the main rights attaching to property is the right to exclude others ...." (citation omitted) );
 
 Lingle v. Chevron U.S.A., Inc.
 
 ,
 
 544 U.S. 528
 
 , 539,
 
 125 S.Ct. 2074
 
 ,
 
 161 L.Ed.2d 876
 
 (2005) ;
 
 College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.
 
 ,
 
 527 U.S. 666
 
 , 673,
 
 119 S.Ct. 2219
 
 ,
 
 144 L.Ed.2d 605
 
 (1999) ;
 
 Kaiser Aetna v. United States
 
 ,
 
 444 U.S. 164
 
 , 176, 179-80 & n.11,
 
 100 S.Ct. 383
 
 ,
 
 62 L.Ed.2d 332
 
 (1979).
 

 Because of its jealous protection of private property rights, the common law recognized only a limited number of exceptions to the right to exclude. The first Restatement of Torts lists many of these common-law privileges.
 
 See
 

 Palmer
 
 , 293 Va. at 581-82, 801 S.E.2d at 418 (citing Restatement of Torts §§ 191 - 211 (1934) ). The most potent exception is the sovereign right of the government to subordinate private property ownership to the greater needs of the public. Our law, however, has only recognized two ways for the government to exercise this power of subordination. The first is the power of eminent domain. The second is the police power.
 
 [2]
 

 The power of eminent domain is qualified by the duty to pay just compensation to the property owner.
 
 See
 
 U.S. Const. amend. V ; Va. Const. art. I, § 11 ; Code § 1-219.1(A).
 
 [3]
 
 When exercised properly, the police power contains no such qualification.
 
 [4]
 
 In part, for that very reason, the permissible scope of the police power has its limits.
 
 See
 

 Lucas v. South Carolina Coastal Council
 
 ,
 
 505 U.S. 1003
 
 , 1014,
 
 112 S.Ct. 2886
 
 ,
 
 120 L.Ed.2d 798
 
 (1992) ("If ... the uses of private property were subject to unbridled, uncompensated qualification under the police power, 'the natural tendency of human nature would be to extend the qualification more and more until at last private property disappeared.' " (alteration and citation omitted) ).
 
 [5]
 

 So too does the power of eminent domain have its own unique limitations. One of which is that
 

 when the legislature has prescribed the conditions and established regulations for the exercise of the right [of eminent domain], the performance of the conditions and the observance of the regulations become an indispensable condition precedent to the exercise of the right, and any failure to comply with the requirements of the statute, will invalidate the confiscation of property.
 

 Christopher G. Tiedeman, A Treatise on the Limitations of Police Power in the United States 377 (1886);
 
 see, e.g.
 
 ,
 
 Charles v. Big Sandy & Cumberland R.R.
 
 ,
 
 142 Va. 512
 
 , 516-18,
 
 129 S.E. 384
 
 , 385 (1925).
 
 [6]
 

 II.
 

 A.
 

 In this case, a private company wants to build an interstate pipeline across private property and, quite prudently, desires to survey the property along the proposed route
 before doing so. As it has in other contexts, the General Assembly has vested the pipeline company with the sovereign's power to override the landowner's common-law right to exclude the public, thereby converting the company from a trespasser into a lawful licensee. The fact that the license comes from the legislature rather than the landowner is of no consequence, of course, so long as the company has not exceeded its delegated sovereign authority.
 

 In Code § 56-49.01(A), the General Assembly did not purport to delegate its inherent police power to ACP, and ACP does not claim to be acting pursuant to such delegated authority. Instead, the legislature predicated the entire enterprise on the premise that the pipeline company's entry onto private property-both for purposes of surveys and later construction-would be constitutionally justified by the power of eminent domain. This premise explains why Code § 56-49.01(D) provides for recovery of "actual damages" resulting from the survey entry, a remedy wholly unnecessary in the police-power context where compensation is unavailable,
 
 see
 

 supra
 
 at 794 & note 4.
 

 We recently addressed these issues in
 
 Palmer
 
 . We observed that "every state has codified the common law privilege of a body
 
 exercising eminent domain authority
 
 to enter private property to conduct preliminary surveys without trespass liability. Virginia statutory law has done so for 235 years."
 
 Palmer
 
 , 293 Va. at 582, 801 S.E.2d at 418-19 (emphasis added) (footnote omitted). In our survey of Virginia law, we emphasized: "
 
 Most relevant to the present case
 
 , the Code of 1904 granted entry-for-survey authority to 'any company' vested with
 
 eminent domain authority
 
 ."
 
 Id.
 
 at 583, 801 S.E.2d at 419 (emphases added) (alteration and citation omitted).
 

 We also took note of the current Virginia eminent-domain statute that extends the same entry-for-survey "privilege to 'any petitioner
 
 exercising
 
 '
 
 the power of eminent domain
 
 ."
 
 Id.
 
 (emphasis added) (quoting Code § 25.1-203(A) ). The Restatement of Torts, which we relied upon in
 
 Palmer
 
 , confirms this interpretation. It classifies the common-law privilege to enter another's land for survey purposes as an "entry pursuant to legislative duty or authority" and states that, if a "legislative enactment" creates a "duty or authority" to enter another's land, an actor is privileged to enter that land "in so far as the entry is reasonably necessary" to perform such duty or to exercise such authority "if, but only if, all the requirements of the enactment are fulfilled." Restatement of Torts § 211, at 529 (emphasis and capitalization omitted).
 

 In other words, "[i]n order that the actor may avail himself of the statutory privilege, it is necessary that all the provisions of the statute ... by way of condition precedent to entry on his part, shall have been complied with."
 
 Id.
 
 cmt. j, at 532-33.
 

 Thus, if
 
 any one of the requirements
 
 imposed by the enactment is not fulfilled, although the accomplishment of the purpose of the enactment may not thereby be invalidated, the actor is subject to liability to the possessor for his entry and for all harm resulting ... and the actor's privilege to continue on the land to complete the accomplishment of his purpose ceases.
 

 Id.
 
 cmt. i, at 532 (emphasis added). This language also appears in the second Restatement.
 
 See
 
 Restatement (Second) of Torts § 211 & cmts. i-j, at 398, 400-01 (1965).
 

 Our unanimous opinion in
 
 Palmer
 
 predicated the statutory entry-for-survey privilege on the pipeline company being vested with eminent domain authority. Though the source of that power was debated in
 
 Palmer
 
 ,
 
 [7]
 
 we never resolved the issue. In the present case, however, both the majority and I agree that the only source of that power is the Natural Gas Act,
 
 15 U.S.C. §§ 717
 
 - 717z, which provides FERC with exclusive power to regulate the transportation of natural gas in interstate commerce and grants to natural gas companies, as defined in 15 U.S.C. § 717a(6), the power of eminent domain only
 
 after
 
 FERC issues a certificate,
 
 see
 
 15 U.S.C. § 717f(h).
 
 See generally
 

 East Tenn. Nat. Gas Co. v. Sage
 
 ,
 
 361 F.3d 808
 
 , 818 (4th Cir. 2004). This eminent-domain rationale finds its textual expression in Code § 56-49.01(A).
 

 B.
 

 The majority sidelines the analytical basis for
 
 Palmer
 
 with the observation that, at the time we issued our opinion, ACP had not yet received its FERC certificate.
 
 See
 

 ante
 
 at 787-88 note 4. FERC issued a certificate to ACP in October 2017, three months after our opinion in
 
 Palmer
 
 . Therefore, according to the majority, we could not have meant what we said about the eminent-domain rationale underlying Code § 56-49.01(A) because "ACP was not vested with eminent domain authority" at the time of our decision and thus "our holding could not have been premised on the exercise of that federal eminent domain authority."
 
 Ante
 
 at 788 note 4. This reasoning fails for at least two reasons.
 

 First, like the present case,
 
 Palmer
 
 was an appeal of a declaratory judgment action. Both our Court and the circuit court were asked to declare the future rights of the parties based upon the present law.
 
 See generally
 

 Cherrie v. Virginia Health Servs., Inc.
 
 ,
 
 292 Va. 309
 
 , 317-18 & n.2,
 
 787 S.E.2d 855
 
 , 859 & n.2 (2016) (recognizing that a declaratory judgment proceeding is intended "to permit the declaration of ... rights before they mature" (citation omitted) ). We did just that by predicating ACP's right of entry under Code § 56-49.01(A) on it being vested with the power to exercise "eminent domain authority."
 
 See
 

 Palmer
 
 , 293 Va. at 581-83, 801 S.E.2d at 418-19. "
 
 Most relevant to the present case
 
 ," we said, an earlier Code provision similarly "granted entry-for-survey authority to 'any company' vested with eminent domain authority."
 
 Id.
 
 at 583, 801 S.E.2d at 419 (emphasis added) (alteration and citation omitted). Our analysis focused on this "[m]ost relevant" point,
 
 id.
 
 , because we were answering the legal question not under past circumstances only, but also under circumstances that would arise in the foreseeable future as well-including those arising three months later when ACP ultimately obtained a FERC certificate.
 

 Second, the majority states that "it is clear that our holding was based entirely on the General Assembly's decision to specifically extend the privilege to natural gas companies under Code § 56-49.01, regardless of the prior issuance of a FERC certificate."
 
 Ante
 
 at 788 note 4. This statement exposes the conceptual error at the heart of the majority's analysis-not because the statement is wrong, but rather misunderstood. Our holding in
 
 Palmer
 
 was of course "based entirely on ... Code § 56-49.01,"
 
 ante
 
 at 788 note 4. So is my dissent in this case. The question then and now is how to interpret Code § 56-49.01.
 

 Palmer
 
 observed that statutory rights of entry have traditionally been granted to entities "
 
 vested
 
 with eminent domain authority,"
 
 Palmer
 
 , 293 Va. at 583, 801 S.E.2d at 419 (emphasis added), not only to entities actually "
 
 exercis
 
 [
 
 ing
 
 ] ... that federal eminent domain authority,"
 
 ante
 
 at 788 note 4 (emphasis added), at the time of the nonconsensual entry. This traditional view explains precondition (i) in Code § 56-49.01(A) and shows how excising it from the statute-by interpreting "and" to mean "or"-erroneously leaves precondition (ii) as the only remaining, rather feeble, check on the power of a pipeline company to enter private property against a landowner's will.
 

 III.
 

 Given this background, I cannot accept the majority's assertion that "and" means "or" in Code § 56-49.01(A). Again, this provision includes two preconditions: that the survey is "
 
 necessary
 
 (i) to satisfy any regulatory requirements
 
 and
 
 (ii) for the selection of the most advantageous location or route, the improvement or straightening of its line or works, changes of location or construction, or providing additional facilities." Code § 56-49.01(A) (emphases added).
 

 A.
 

 With respect to the first precondition-romanette (i)-no FERC "regulatory requirements" make it "necessary,"
 
 id.
 
 , for a pipeline company, prior to obtaining a certificate, to perform physical surveys of private
 property against a landowner's will. To the contrary, the FERC regulations assume that some landowners may not consent to the surveys but nonetheless permit the certificate application process to go forward without interruption.
 
 See
 

 18 C.F.R. §§ 157.8
 
 (a)(1) ;
 

 id.
 

 § 380.12(a)(2) ;
 

 id.
 

 § 380.12(f)(2)(ii) ;
 

 id.
 

 § 385.2013.
 
 [8]
 

 Once FERC issues a certificate, however, the pipeline company must complete all required surveys within the time prescribed by the order granting the certificate or before construction.
 
 See
 

 id.
 

 § 157.5(a) (requiring applications to contain all information necessary to advise FERC fully concerning the project);
 

 id.
 

 § 380.12(f)(1)(ii), (f)(2) (requiring survey reports to be included in the environmental report regarding cultural resources attached to the initial application);
 

 id.
 

 § 380.12(f)(2)(ii) (requiring surveys to be conducted "after access is granted" if landowners do not consent and allowing the reports to be "filed after a certificate is issued");
 

 id.
 

 § 380.12(f)(5) (requiring all cultural resource reports and plans to be approved before construction).
 

 In cases where landowners have denied a pipeline company survey access, a host of FERC administrative rulings have consistently granted the company a certificate conditioned upon the completion of all surveys once the company gains access through the power of eminent domain, often including conditions requiring the completion of revised surveys, remaining required surveys, and new surveys after construction.
 
 [9]
 
 These FERC administrative rulings, fully consistent with FERC regulations, confirm that surveys do not constitute a regulatory requirement until
 
 after
 
 FERC issues a certificate and thereby grants the pipeline company the power of eminent domain.
 

 In fact, in several instances, the survey requirements do not come directly from the FERC regulations themselves but instead from other federal and state entities through a consultative process that the FERC regulations impose.
 
 [10]
 
 These entities, in turn, impose survey requirements that the FERC regulations require the pipeline company to follow.
 
 [11]
 
 The only specific "surveys" directly
 required by the regulations governing applications are survey drawings of facilities and noise surveys.
 
 [12]
 
 Therefore, there is no regulatory requirement of any kind to conduct a survey until
 
 after
 
 FERC has issued a certificate, at which point the regulations require the pipeline company to supplement its application with previously uncompleted surveys. As ACP conceded at oral argument, there is "no C.F.R. provision" requiring a pre-certificate survey against a landowner's will.
 
 See
 
 Oral Argument Audio at 26:57 to 28:32.
 

 In the context of Code § 56-49.01(A), the first precondition to the right of entry-that the entry be "necessary (i) to satisfy any regulatory requirements"-fits securely within the constitutional justification for the statute that we explored at length in
 
 Palmer
 
 . The FERC regulations encourage on-site surveys prior to obtaining a certificate so long as the landowner consents.
 
 See
 
 Revision of Existing Regulations Under Part 157 and Related Sections of the Commission's Regulations Under the Natural Gas Act,
 
 88 FERC P61,297
 
 , 1999 FERC LEXIS 2056, at *74-76, *84-85 (1999) ("[W]e understand that if access to the property is denied by the landowner, comments for the areas to which access has been denied would be filed after the certificate is issued. The Commission will determine on a case-by-case basis if it is necessary to issue a certificate contingent on the pipeline receiving clearances before construction begins.").
 
 [13]
 

 In short, the regulatory requirement to conduct surveys of private property owned by a nonconsenting landowner arises only after FERC issues its certificate authorizing a pipeline company to employ the power of eminent domain. Code § 56-49.01(A) grants a pipeline company the power to supersede a landowner's will only after the company has received a certificate because only then does the Natural Gas Act vest the company with the power of eminent domain,
 
 see
 
 15 U.S.C. § 717f(h). The pipeline company's nonconsensual survey is a statutory precursor to the actual exercise of that power.
 

 The word "and" between preconditions (i) and (ii) of Code § 56-49.01(A) means exactly what it says. Its plain meaning squares the text of the statute with the constitutional justification for it under the power of eminent domain that we explained in
 
 Palmer
 
 . Reading the statute to wholly dispense with precondition (i) undermines the constitutional legitimacy of the statutory scheme. Doing so allows a pipeline company without a FERC certificate (even a pipeline company that has not even applied for a certificate) to enter private property against a landowner's will. In this respect, the majority's reasoning has no limiting principle. Any natural gas company, as defined by 15 U.S.C. § 717a(6), apparently now has a legal right to overrule a landowner's common-law right to exclude trespassers so long as the company thinks that doing so might help it decide whether, and if so, where, to build a future pipeline. Given the jealous protection that our law has traditionally afforded property rights, I cannot presume that the General Assembly intended that we transpose "or" in place of "and" to reach this result.
 

 B.
 

 In support of its disjunctive interpretation, the majority relies primarily on a single Virginia case,
 
 South East Public Service Corp. of Virginia v. Commonwealth
 
 ,
 
 165 Va. 116
 
 ,
 
 181 S.E. 448
 
 (1935).
 
 See
 

 ante
 
 at 786. In that case, while we recognized that there are instances in which "or" can mean "and," we actually held that "or" in a statute meant "or," not "and," because, like most readers of English, "[w]e naturally assume[d] ... that the draftsman intended the word 'or' to have its ordinary, literal and disjunctive meaning."
 
 South E. Pub. Serv. Corp.
 
 ,
 
 165 Va. at 122
 
 ,
 
 181 S.E. at 450
 
 .
 
 [14]
 

 The same is true with the word "and." We naturally assume that "[t]he use of the word 'and' ... points to the conclusion that it was the intention of the legislature that 'and' should have its ordinary, literal conjunctive meaning."
 
 Safeway Stores, Inc. v. Milk Comm'n
 
 ,
 
 197 Va. 69
 
 , 74,
 
 87 S.E.2d 769
 
 , 772 (1955).
 
 See generally
 
 Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 116 (2012) ("The conjunctions
 
 and
 
 and
 
 or
 
 are two of the elemental words in the English language. Under the conjunctive/disjunctive canon,
 
 and
 
 combines items while
 
 or
 
 creates alternatives." (emphases in original) ).
 

 It is often said that "[i]n legal codes, as in ordinary conversation, 'a word is known by the company it keeps.' "
 
 Tvardek v. Powhatan Vill. Homeowners Ass'n, Inc.
 
 ,
 
 291 Va. 269
 
 , 278,
 
 784 S.E.2d 280
 
 , 285 (2016) (citation omitted). That statement is particularly true with the word "and." Suppose a statute stated that a police officer may trespass onto private property if it is
 
 necessary
 
 (i) to chase in hot pursuit a violent felon
 
 and
 
 (ii) the officer deems it reasonable to do so under the circumstances. I would be shocked if the officer interpreted the statute to authorize him to chase a high-school truant into a neighbor's home solely because he, the officer, personally thought it was reasonable to do so. The
 
 necessary
 
 predicate qualifying both preconditions amplifies the natural understanding of "and" to truly mean "and."
 

 I acknowledge the majority's footnote 3, listing 37 out-of-state cases recognizing that "and" can mean "or" and vice versa.
 
 See
 

 ante
 
 at 786 note 3. No doubt that is sometimes true.
 
 See generally
 
 Scalia & Garner,
 
 supra
 
 , at 116-25 (describing certain "nuances" to the general conjunctive/disjunctive canon that stem from "negatives, plurals, and various specific wordings" (emphases omitted) ). But this transposition is still an exception to the general rule. There are likely thousands of cases in which courts interpret "and" to mean "and" without explaining why. The linguistic default is that "and" is conjunctive and "or" is disjunctive. It is only the anomalous cases in which courts transpose these words that require an explanation.
 

 A review of these 37 cases will show that not one of them has an explanation applicable to our case. Not one interprets a statutory text like Code § 56-49.01(A) that imposes preconditions on a legal license authorizing an action (such as a trespass) that, absent the license, would otherwise be unlawful. Thus, none of these cases refute the view that the gravity of granting such a license counsels a cautious, not expansive, reading of the statute. Nor do these cases involve statutory texts like Code § 56-49.01(A) that include items in a conjunctive list, separated by romanettes, and introduced as "necessary" preconditions. A list of "necessary" prerequisites connotes a collective
 
 necessity
 
 , not a smorgasbord of options from which one can pick and choose.
 

 Perhaps most important, not one of these 37 cases was decided by a Virginia court. And our own precedent provides sufficient clarity on this issue. As noted earlier,
 
 see
 

 supra
 
 at 798-99, in
 
 South East Public Service Corp.
 
 we recognized that there may be anomalous textual circumstances where "and" can legitimately mean "or."
 
 See
 

 165 Va. at 122
 
 ,
 
 181 S.E. at 450
 
 . But we emphasized that a judicial transposition of "and" to "or" should only occur "[w]hen, and
 
 only when
 
 , necessary to effectuate
 
 the obvious intention
 
 of the legislature."
 

 Id.
 

 (emphases added) (citation omitted). The only time that we ever find such a textual anomaly to exist-making it obvious that "and" should mean "or"-is when "the legislative intent would be
 
 completely aborted
 
 if the conjunctive words in th[e] statute are not construed as disjunctive."
 
 Industrial Dev. Auth. v. La France Cleaners & Laundry Corp.
 
 ,
 
 216 Va. 277
 
 , 281,
 
 217 S.E.2d 879
 
 , 882 (1975) (emphasis added). The majority offers four cascading arguments as to why that circumstance exists here. I find none of them persuasive.
 

 1.
 

 The majority begins with the assertion that "the legislative intent behind Code § 56-49.01(A)... is obvious on the face of the statute: to grant natural gas companies access to private property for the purpose of conducting certain activities related to the possible construction of a natural gas pipeline."
 
 Ante
 
 at 787. That may be the general idea, but the question that we must answer is more specific: Did the legislature intend to confer on a pipeline company the power to enter private property against a landowner's will
 
 before
 
 FERC grants the company the power of eminent domain? The majority answers this question with several brief observations:
 

 If the "and" separating the enumerated provisions were read in the conjunctive, natural gas companies could only conduct those activities necessary to satisfy both provisions. Yet, it is clear that not all activities necessary to satisfy regulatory requirements are also necessary for the selection of the most advantageous route, etc., and vice versa.
 

 Ante
 
 at 788. This logic does not follow. It assumes that the General Assembly cannot require both preconditions (i) and (ii) because each of those subsections may demand something that the other does not. Perhaps so. But what difference does that make? Would we not expect that stating preconditions (i) and (ii) separately would emphasize their separate requirements?
 
 [15]
 

 Not in this case, the majority answers, because "the
 
 need
 
 to satisfy regulatory requirements occurs at an entirely different time from the
 
 need
 
 to select and/or improve the pipeline and its route."
 
 Ante
 
 at 788 (emphases added). This ambiguous assertion contributes little to the argument. The "select and/or improve" timeline,
 
 ante
 
 at 788, spans an indeterminate period before and after the issuance of a FERC certificate. The only question that we should be asking is whether some administrative regulation creates a need-a
 
 regulatory need
 
 -for a pipeline company to enter private property against a landowner's will when selecting a proposed pipeline route. The answer is no.
 

 As noted earlier,
 
 see
 

 supra
 
 at 796-98 and accompanying footnotes, the FERC pre-certificate application regulations do not require a pipeline company to enter private property against a landowner's will.
 
 See
 

 18 C.F.R. § 157.8
 
 (a)(1) ;
 

 id.
 

 § 380.12(a)(2), (f)(2)(ii) ;
 

 id.
 

 § 385.2013. Instead, they assume that many landowners will consent and that the pipeline company can enter the property of those who do not consent after FERC issues a certificate conferring the power of eminent domain,
 
 see
 

 id.
 

 § 157.8(a)(1) ;
 

 id.
 

 § 380.12(a)(2), (f)(2)(ii) ;
 

 id.
 

 § 385.2013, which is the underlying constitutional justification for what would otherwise be an actionable trespass. The majority's need-sequencing argument thus relies on the unproven assumption that a pipeline company needs to have unauthorized access to private property prior to obtaining a FERC certificate that would authorize that very access.
 

 2.
 

 Next, the majority contends that interpreting "and" in its ordinary conjunctive sense "would render certain portions of the statute meaningless."
 
 Ante
 
 at 788-89. As the majority correctly observes,
 
 see
 

 ante
 
 at 789, precondition (ii) itself lists several different disjunctive reasons for entering private property. Some occur early in the process (e.g., "the selection of the most advantageous location or route"), and some long afterwards (e.g., "improv[ing] or straightening ... a line or works," "changing the location or construction of a pipeline," or "providing additional facilities").
 
 Ante
 
 at 789 (alteration omitted) (quoting Code § 56-49.01(A) ). From that observation, the majority concludes that "these [later] activities would be conducted after, and independent of, the satisfaction of any regulatory requirements required to obtain the certificate."
 
 Ante
 
 at 789.
 

 The error in this thinking is that precondition (i) refers generally to "regulatory requirements," Code § 56-49.01(A), not solely to the "regulatory requirements required to obtain the certificate,"
 
 ante
 
 at 789. The Natural Gas Act requires pipeline companies to maintain, as well as obtain, a FERC certificate to sell and transport natural gas.
 
 See
 
 15 U.S.C. § 717f(c)(1). This provision also prohibits a pipeline company from engaging in the "construction or extension of any facilities" for the transportation or sale of natural gas without a certificate of public convenience and necessity "authorizing such acts or operations."
 

 Id.
 

 In other words, the Natural Gas Act requires further certificates (and thus surveys) for the modification or extension of existing facilities.
 
 [16]
 
 Therefore, regulatory requirements could arise even after the initial certificate.
 

 As a fallback, the majority states that "[e]ven if there were still regulatory requirements that needed to be satisfied after the construction of the pipeline," Code § 56-49.01"would no longer be necessary, because any activities necessary for the satisfaction of regulatory requirements after the pipeline was built would likely be limited to the property to which the natural gas company already has access, i.e., the property occupied by the pipeline."
 
 Ante
 
 at 789 note 7. I do not agree. Precondition (ii) of Code § 56-49.01(A) permits surveys necessary for "changes of location or construction" and "providing additional facilities" for an existing pipeline. Both justifications could easily necessitate surveys of private property outside of the previously condemned strip or on adjacent property not subject to any prior condemnation order.
 
 See
 

 supra
 
 at 801 & note 16.
 

 3.
 

 Continuing, the majority states that "[w]e must also consider the nature of the enumerated provisions."
 
 Ante
 
 at 789. The first is
 "entirely objective" (whether an activity is necessary to satisfy a regulatory requirement or not), while the second "has a significant subjective component" (determining "the most advantageous location or route").
 
 Ante
 
 at 789 (emphasis and citation omitted). From that accurate observation, the majority concludes:
 

 Reading the "and" separating these provisions in the conjunctive effectively eliminates [a pipeline company's] discretion, as a natural gas company would only be permitted to conduct those activities that are necessary to satisfy both provisions. The factors that a natural gas company could weigh in selecting the most advantageous route or improving the existing route would be limited to only those factors that are also necessary to satisfy the regulatory requirements. Such a construction of the statute would effectively eliminate any differentiation in the two enumerated provisions.
 

 Ante
 
 at 789.
 

 This argument simply assumes its own conclusion: Because a pipeline company has the discretion to figure out where the pipeline should go or how to improve it, it should also have the discretion to enter private property against a landowner's will. Under this view, imposing Code § 56-49.01(A) 's first precondition-which limits entry onto private property to the extent "necessary (i) to satisfy any regulatory requirements"-means that a pipeline company cannot use its discretion to enter onto private property against a landowner's will when no "regulatory requirements" make it "necessary" to do so, Code § 56-49.01(A). That result, I agree, is exactly what precondition (i) does. What I do not understand is why the majority believes that simply stating that result means that it cannot be true.
 

 The majority's only answer appears to be that "by inextricably coupling the two enumerated provisions, any discretion granted to natural gas companies would be taken away for no discernible purpose."
 
 Ante
 
 at 788. No discernible purpose? What about the legislative purpose to withhold from a pipeline company the legal license to trespass onto private property when no "regulatory requirements" make it "necessary" to do so, Code § 56-49.01(A) ? This limitation, it seems to me, is the primary, easily discernable purpose of the first precondition.
 

 The majority adds that the second precondition would be "eviscerated" if combined with the first.
 
 Ante
 
 at 789. How is that so? A pipeline company can weigh as many discretionary factors as it deems prudent in making the determination that a survey of a particular parcel is necessary to select the most advantageous route for a pipeline or to improve an existing pipeline. Imposing the additional requirement that the survey also be necessary to satisfy regulatory requirements does not preclude the use of any discretionary factors that a pipeline company can consider in making the subjective determination that precondition (ii) requires.
 

 4.
 

 Finally, the majority asserts that its conclusion "is further supported by .... the fact that, within the first sentence of this statute, the General Assembly has unequivocally used the word 'and' in both the conjunctive and the disjunctive."
 
 Ante
 
 at 789. Apparently this observation is an invitation to compare and contrast other uses of the word "and" in "the first sentence of this statute."
 
 Ante
 
 at 789. If so, I accept that invitation and point out that immediately following the phrase at issue in this case is another phrase using "and" that lists three items with parenthetical subdivisions. This phrase states that a pipeline company
 

 may enter upon any property without the written permission of its owner if (a) the natural gas company has requested the owner's permission to inspect the property as provided in subsection B, (b) the owner's written permission is not received prior to the date entry is proposed,
 
 and
 
 (c) the natural gas company has given the owner notice of intent to enter as provided in subsection C.
 

 Code § 56-49.01(A) (emphasis added). There can be no doubt that the "and" in this example means "and," not "or."
 
 See
 

 Chaffins v. Atlantic Coast Pipeline, LLC
 
 ,
 
 293 Va. 564
 
 , 569,
 
 801 S.E.2d 189
 
 , 191 (2017).
 
 [17]
 
 Because this phrase lists the necessary conditions for a nonconsensual entry, it is highly analogous to the phrase used just a few words earlier in the same sentence and at issue here, undermining the majority's reliance on the various uses of "and" in this provision.
 

 IV.
 

 In sum, the intent of Code § 56-49.01(A) would not be "completely aborted,"
 
 La France Cleaners & Laundry Corp.
 
 ,
 
 216 Va. at 281
 
 ,
 
 217 S.E.2d at 882
 
 , if we interpreted "and" to mean "and" in this statute. If anything, the opposite is true. Judicially substituting "or" in place of "and" in the phrase at issue here decouples the right of nonconsensual entry from its constitutional justification under the power of eminent domain. It subordinates the ancient common-law rights of private property owners to the commercial interests of a pipeline company that is under no legal requirement to enter onto another's land. And it effectively authorizes a foreign pipeline company that has neither applied for, nor received, a FERC certificate to trespass onto private property within the Commonwealth based solely on the company's self-interest in determining the location of a future pipeline.
 

 I respectfully dissent.
 

 APPENDIX TO DISSENTING OPINION
 

 McCurdy v. Mountain Valley Pipeline, LLC
 
 , No. 1:15-03833,
 
 2015 WL 4497407
 
 , at *2-4,
 
 2015 U.S. Dist. LEXIS 96062
 
 , at *6-10 (S.D. W. Va. July 23, 2015) (unpublished) (noting that FERC will often issue conditional certificates that afford a pipeline company the power of eminent domain and thus the right to survey);
 

 PennEast Pipeline Co.
 
 ,
 
 162 FERC P61,053
 
 , 2018 FERC LEXIS 90, at *84-86, *92-93, *108-09, *113-15, *117, *121-22, *124-33, *150-51, *213, *215-16, *220, *223-26, *229-34, *237-39, *242 (2018);
 

 Mountain Valley Pipeline, LLC
 
 ,
 
 161 FERC P61,043
 
 , 61,317, 61,319-20, 61,324, 61,331-32, 61,342-47 (2017);
 

 Atlantic Coast Pipeline, LLC
 
 ,
 
 161 FERC P61,042
 
 , 61,259, 61,262, 61,264-65, 61,268-69, 61,280-81, 61,284-88 (2017);
 

 Tennessee Gas Pipeline Co.
 
 ,
 
 160 FERC P61,144
 
 , 61,615-16, 61,626-30 (2017);
 

 Transcontinental Gas Pipe Line Co.
 
 ,
 
 155 FERC P61,016
 
 , 61,071, 61,086, 61,089-91 (2016);
 

 Constitution Pipeline Co., LLC
 
 ,
 
 154 FERC P61,046
 
 , 61,269-71 (2016);
 

 Algonquin Gas Transmission, LLC
 
 ,
 
 150 FERC P61,163
 
 , 62,098-99, 62,107, 62,110-11, 62,113-14 (2015),
 
 amended on other grounds by
 

 157 FERC P61,011
 
 (2016);
 

 Constitution Pipeline Co.
 
 ,
 
 149 FERC P61,119
 
 , 62,214-15, 62,223, 62,225-30 (2014);
 

 City of Clarksville
 
 ,
 
 149 FERC P61,022
 
 , 61,075-76, 61,078-81 (2014);
 

 Sierrita Gas Pipeline, LLC
 
 ,
 
 147 FERC P61,192
 
 , 62,062, 62,065, 62,070-72 (2014);
 

 Bison Pipeline LLC
 
 ,
 
 131 FERC P61,013
 
 , 61,086-87, 61,090-93, 61,095-96,
 
 amended on other grounds by
 

 132 FERC P62,163
 
 (2010),
 
 and vacated on other grounds
 
 ,
 
 149 FERC P61,243
 
 (2014);
 

 AES Sparrows Point LNG, LLC
 
 ,
 
 129 FERC P61,245
 
 , 61,285-87 & n.27, 61,297-98, 61,315-16, 61,319-21 (2009);
 

 Pacific Connector Gas Pipeline, LP
 
 ,
 
 129 FERC P61,234
 
 , 62,131, 62,135, 62,137, 62,141-43, 62,145, 62,147-48 (2009),
 
 vacated on other grounds
 
 ,
 
 139 FERC P61,040
 
 (2012);
 

 Florida Gas Transmission Co.
 
 ,
 
 129 FERC P61,150
 
 , 61,653, 61,657, 61,662, 61,664-66 (2009),
 
 reh'g granted on other grounds
 
 ,
 
 130 FERC P61,194
 
 (2010);
 

 Chestnut Ridge Storage LLC
 
 ,
 
 128 FERC P61,210
 
 , 61,980, 61,984-85, 61,987-91 (2009),
 
 vacated on other grounds
 
 ,
 
 139 FERC P61,149
 
 (2012);
 

 Bradwood Landing LLC
 
 ,
 
 126 FERC P61,035
 
 , 61,181, 61,183, 61,192 (2009);
 

 AES Sparrows Point LNG, LLC
 
 ,
 
 126 FERC P61,019
 
 , 61,061-62, 61,066-67, 61,069-71, 61,073-74, 61,077-84, 61,087-90,
 
 modified
 
 ,
 
 129 FERC P61,245
 
 (2009),
 
 and vacated on other grounds
 
 ,
 
 145 FERC P61,113
 
 (2013);
 

 MarkWest Pioneer, L.L.C.
 
 ,
 
 125 FERC P61,165
 
 , 61,877, 61,880-83 (2008);
 

 Bradwood Landing LLC
 
 ,
 
 124 FERC P61,257
 
 , 62,306, 62,313-15, 62,318, 62,322-24, 62,327-30 (2008),
 
 vacated as moot sub nom.
 

 Oregon v. Federal Energy Regulatory Comm'n
 
 ,
 
 636 F.3d 1203
 
 (9th Cir. 2011) ;
 

 Rockies Express Pipeline LLC
 
 ,
 
 123 FERC P61,234
 
 , 62,444, 62,447-53, 62,457-58, 62,462-66, 62,468-70 (2008),
 
 amended on other grounds by
 

 126 FERC P61,225
 
 (2009);
 

 Gulf Crossing Pipeline Co.
 
 ,
 
 123 FERC P61,100
 
 , 61,744-45, 61,747, 61,749-51 (2008),
 
 amended on other grounds by
 

 127 FERC P62,013
 
 (2009),
 
 and
 

 127 FERC P62,140
 
 (2009),
 
 and
 

 127 FERC P61,299
 
 (2009);
 

 Southeast Supply Header, LLC
 
 ,
 
 120 FERC P61,257
 
 , 62,082-84, 62,086-91 (2007),
 
 amended on other grounds by
 

 123 FERC P61,310
 
 (2008),
 
 and
 

 124 FERC P61,120
 
 (2008);
 

 Millenium Pipeline Co.
 
 ,
 
 117 FERC P61,319
 
 , 62,579-80, 62,582, 62,585-87, 62,589, 62,593-600 (2006),
 
 reh'g granted in part on other grounds sub nom. Empire State Pipeline
 
 ,
 
 119 FERC P61,173
 
 (2007),
 
 and amended on other grounds sub nom. by Empire Pipeline, Inc.
 
 ,
 
 121 FERC P61,129
 
 (2007),
 
 and
 

 124 FERC P62,177
 
 (2008),
 
 and vacated in part on other grounds sub nom. Algonquin Gas Transmission, LLC
 
 ,
 
 129 FERC P61,049
 
 (2009);
 

 Midwestern Gas Transmission Co.
 
 ,
 
 116 FERC P61,182
 
 , 61,778-79, 61,785-86, 61,789-93 & n.81, 61,795-99 (2006);
 

 Midwestern Gas Transmission Co.
 
 ,
 
 114 FERC P61,257
 
 , 61,813, 61,820-24, 61,827-31 (2006);
 

 Liberty Gas Storage LLC
 
 ,
 
 113 FERC P61,247
 
 , 61,982-83, 61,988-92 (2005),
 
 amended on other grounds by
 

 117 FERC P61,224
 
 (2006),
 
 and
 

 133 FERC P62,033
 
 (2010);
 

 Golden Pass LNG Terminal LP
 
 ,
 
 112 FERC P61,041
 
 , 61,310, 61,313-18 (2005),
 
 amended on other grounds sub nom. by Golden Pass Pipeline LP
 
 ,
 
 117 FERC P61,015
 
 (2006),
 
 and
 

 117 FERC P61,332
 
 (2006),
 
 and amended on other grounds sub nom. by Golden Pass Pipeline LLC
 
 ,
 
 134 FERC P61,037
 
 (2011);
 

 East Tenn. Nat. Gas Co.
 
 ,
 
 105 FERC P61,139
 
 , 61,738-39 (2003);
 

 East Tenn. Nat. Gas Co.
 
 ,
 
 102 FERC P61,225
 
 , 61,659 (2003);
 

 Islander E. Pipeline Co.
 
 ,
 
 102 FERC P61,054
 
 , 61,120, 61,136-38 (2003);
 

 East Tenn. Nat. Gas Co.
 
 ,
 
 101 FERC P61,188
 
 , 61,753-56, 61,764-71 (2002),
 
 vacated in part on other grounds sub nom. East Tenn. Nat. Gas, LLC
 
 ,
 
 127 FERC P61,259
 
 (2009);
 

 Islander E. Pipeline Co.
 
 ,
 
 100 FERC P61,276
 
 , 62,123, 62,125-26, 62,129-31 (2002);
 

 Independence Pipeline Co.
 
 ,
 
 92 FERC P61,268
 
 , 61,893 (2000);
 

 Independence Pipeline Co.
 
 ,
 
 89 FERC P61,283
 
 , 61,834, 61,856-57, 61,862, 61,874-78, 61,880-84 (1999),
 
 modified
 
 ,
 
 91 FERC P61,102
 
 (2000),
 
 and amended on other grounds sub nom. by Transcontinental Gas Pipe Line Corp.
 
 ,
 
 93 FERC P61,241
 
 (2000),
 
 and vacated in part on other grounds
 
 ,
 
 100 FERC P61,082
 
 (2002);
 

 Southern Nat. Gas Co.
 
 ,
 
 85 FERC P61,134
 
 , 61,512-13, 61,527, 61,534, 61,537-38 (1998);
 

 Alliance Pipeline L.P.
 
 ,
 
 84 FERC P61,239
 
 , 62,216, 62,221-22, 62,224-29 (1998);
 

 Portland Nat. Gas Transmission Sys.
 
 ,
 
 83 FERC P61,080
 
 , 61,392-95 (1998);
 

 Destin Pipeline Co.
 
 ,
 
 81 FERC P61,211
 
 , 61,898-99, 61,901-02, 61,904-06 (1997);
 

 Mojave Pipeline Co.
 
 ,
 
 72 FERC P61,167
 
 , 61,833, 61,838-40, 61,842-44 (1995),
 
 vacated as moot
 
 ,
 
 75 FERC P61,108
 
 (1996),
 
 appeal dismissed as moot
 
 ,
 
 Public Utils. Comm'n v. Federal Energy Regulatory Comm'n
 
 ,
 
 100 F.3d 1451
 
 (9th Cir. 1996),
 
 enforced
 
 ,
 
 78 FERC P61,163
 
 (1997) ;
 

 Southern Nat. Gas Co.
 
 ,
 
 71 FERC P61,101
 
 , 61,338-39, 61,341-44 (1995);
 

 Gateway Pipeline Co.
 
 ,
 
 55 FERC P61,488
 
 , 62,682-85, 62,690-92 (1991),
 
 amended on other grounds by
 

 59 FERC P61,088
 
 (1992);
 

 Iroquois Gas Transmission Sys., L.P.
 
 ,
 
 53 FERC P61,194
 
 , 61,760-62 & n.210, 61,767, 61,788-93 (1990),
 
 amended on other grounds by
 

 132 FERC P61,230
 
 (2010);
 

 Columbia Gas Transmission Corp.
 
 ,
 
 40 FERC P61,029
 
 , 61,084-85 (1987).
 

 This case arose in 2015 when several landowners refused to grant ACP permission to enter onto their properties to conduct surveys. At that time, ACP had not received the required Certificate of Public Convenience and Necessity ("certificate") from the Federal Energy Regulatory Commission ("FERC") authorizing the construction of the pipeline. ACP filed a declaratory judgment action against the landowners seeking a judicial declaration of its right to survey their properties prior to obtaining the FERC certificate. In its final order, the circuit court held that Code § 56-49.01(A) authorized ACP's pre-certificate surveys. ACP thereafter entered the landowners' properties to conduct surveys. The landowners appealed, arguing that the pre-certificate surveys violated Code § 56-49.01(A). In October 2017, after we had granted the landowners an appeal to consider this case, FERC issued ACP a certificate. No party has suggested that the post-judgment FERC certificate has mooted any issue on appeal.
 

 Though similar, "the foundations of the police power and the power of eminent domain" rest on different footings.
 
 Mumpower v. Housing Auth.
 
 ,
 
 176 Va. 426
 
 , 435-36,
 
 11 S.E.2d 732
 
 , 734-35 (1940). "The line between eminent domain and the police power is a hard one to hold with constancy and consistency, and it is not surprising that now and again these two great powers of government have been confused."
 
 Id.
 
 at 435-36,
 
 11 S.E.2d at 735
 
 (citation omitted). "Such confusion will be avoided ... by considering each separately; however, the similarity of reason and purpose will be apparent."
 
 Id.
 
 at 436,
 
 11 S.E.2d at 735
 
 .
 

 The landowners in this case do not argue on appeal that Code § 56-49.01 on its face fails to provide a just-compensation remedy for damage to their intangible right to exclude, albeit temporarily, the pipeline surveyors from their property.
 
 See
 
 Oral Argument Audio at 11:28 to 13:14. The majority does not address this issue. Neither do I.
 

 See, e.g.
 
 ,
 
 State Highway & Transp. Comm'r v. Lanier Farm, Inc.
 
 ,
 
 233 Va. 506
 
 , 510,
 
 357 S.E.2d 531
 
 , 533 (1987) ;
 
 Commonwealth ex rel. State Water Control Bd. v. County Utils. Corp.
 
 ,
 
 223 Va. 534
 
 , 542,
 
 290 S.E.2d 867
 
 , 872 (1982) ;
 
 Weber City Sanitation Comm'n v. Craft
 
 ,
 
 196 Va. 1140
 
 , 1148,
 
 87 S.E.2d 153
 
 , 158 (1955) ;
 
 Kornegay v. City of Richmond
 
 ,
 
 185 Va. 1013
 
 , 1030,
 
 41 S.E.2d 45
 
 , 53 (1947) ;
 
 West Bros. Brick v. City of Alexandria
 
 ,
 
 169 Va. 271
 
 , 287,
 
 192 S.E. 881
 
 , 888,
 
 appeal dismissed
 
 ,
 
 302 U.S. 658
 
 ,
 
 58 S.Ct. 369
 
 ,
 
 82 L.Ed. 508
 
 (1937) (per curiam);
 
 Richmond, Fredericksburg & Potomac R.R. v. City of Richmond
 
 ,
 
 67 Va. (26 Gratt.) 83
 
 , 102-04 (1875),
 
 aff'd sub nom.
 

 Railroad v. Richmond
 
 , 96 U.S. (6 Otto) 521,
 
 24 L.Ed. 734
 
 (1878).
 

 See also
 

 Panhandle E. Pipe Line Co. v. State Highway Comm'n
 
 ,
 
 294 U.S. 613
 
 , 622,
 
 55 S.Ct. 563
 
 ,
 
 79 L.Ed. 1090
 
 (1935) ("The police power of a State, while not susceptible of definition with circumstantial precision, must be exercised within a limited ambit .... Under it there is no unrestricted authority to accomplish whatever the public may presently desire. It is the governmental power of self protection, and permits reasonable regulation of rights and property in particulars essential to the preservation of the community from injury.");
 
 Nashville, Chattanooga & St. Louis Ry. v. Walters
 
 ,
 
 294 U.S. 405
 
 , 415 & n.7,
 
 55 S.Ct. 486
 
 ,
 
 79 L.Ed. 949
 
 (1935) ("The police power ... may not be exerted arbitrarily or unreasonably.");
 
 Chicago, Burlington & Quincy Ry. v. Illinois
 
 ,
 
 200 U.S. 561
 
 , 594,
 
 26 S.Ct. 341
 
 ,
 
 50 L.Ed. 596
 
 (1906) ("There are, unquestionably, limitations upon the exercise of the police power which cannot, under any circumstances, be ignored.");
 
 Craft
 
 ,
 
 196 Va. at 1147
 
 , 87 S.E.2d at 158 (stating that an exercise of the police power is valid "so long as unreasonable methods are not employed, nor the natural and constitutional rights of citizens invaded");
 
 Mumpower
 
 ,
 
 176 Va. at 443-44
 
 ,
 
 11 S.E.2d at 738
 
 (stating that an exercise of the police power cannot be "clearly arbitrary and unreasonable" (citations omitted) );
 
 Gorieb v. Fox
 
 ,
 
 145 Va. 554
 
 , 561,
 
 134 S.E. 914
 
 , 916 (1926) (stating that the police power "must never be exercised except in a reasonable manner and for the welfare of the public"),
 
 aff'd
 
 ,
 
 274 U.S. 603
 
 ,
 
 47 S.Ct. 675
 
 ,
 
 71 L.Ed. 1228
 
 (1927).
 

 See also
 
 Thomas M. Cooley, A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of the States of the American Union 528-29 (1868); 3 John F. Dillon, Commentaries on the Law of Municipal Corporations §§ 1040-41, at 1646-48 (5th rev. ed. 1911); Alfred D. Jahr, Law of Eminent Domain: Valuation and Procedure §§ 190, 194-200, at 308-09, 311-20 (1953).
 

 In
 
 Palmer
 
 , ACP's petition for declaratory judgment asserted that it was "vested with the power of eminent domain" under the general statutes governing public service corporations.
 
 See
 
 Petition for Declaratory Judgment at 1-2, para. 3,
 
 Palmer
 
 ,
 
 293 Va. 573
 
 ,
 
 801 S.E.2d 414
 
 (Record No. 160630) (citing Code § 56-49(2) ).
 

 See generally
 
 Office of Energy Projects, Fed. Energy Regulatory Comm'n, Guidelines for Reporting on Cultural Resources Investigations for Natural Gas Projects 3, 16, 19 (July 2017), https://www.ferc.gov/industries/gas/enviro/guidelines/cultural-guidelines-final.pdf (confirming that a pipeline company may identify unsurveyed lands when landowners deny access and that a pipeline company "do[es] not receive eminent domain authority ...
 
 until after a FERC Certificate
 
 ...
 
 is issued
 
 " (emphasis in original) ); 1 Office of Energy Projects, Fed. Energy Regulatory Comm'n, Guidance Manual for Environmental Report Preparation for Applications Filed Under the Natural Gas Act 1-4, 4-43, 4-51 & n.24, 4-68, 4-71 to -72, 4-75, Attachment 1-22 (Feb. 2017), https://www.ferc.gov/industries/gas/enviro/guidelines/guidance-manual-volume1.pdf (describing alternatives when landowners deny access).
 

 See infra
 
 Appendix at 803.
 

 See
 

 18 C.F.R. §§ 157.201
 
 -.218 (allowing a pipeline company that has already obtained an original certificate to apply for a "blanket certificate" authorizing it to acquire, operate, replace, or rearrange its facilities either automatically or with notice to FERC);
 

 id.
 

 § 157.208(c)(9) (requiring a blanket-certificate holder to include consultation results in a request to perform certain activities);
 

 id.
 

 § 157 app. I (requiring a blanket-certificate holder to engage in informal consultations with the U.S. Fish and Wildlife Service and the National Marine Fisheries Service);
 

 id.
 

 § 157 app. II (requiring a blanket-certificate holder to consult with the State Historic Preservation Officer or Tribal Historic Preservation Officer to, among other things, "determine the need for surveys");
 

 id.
 

 § 380.3(b)(2)-(3) (requiring an applicant to "[c]onduct any studies that the Commission staff considers necessary or relevant to determine the impact of the proposal on the human environment and natural resources" and to "[c]onsult with appropriate Federal, regional, State, and local agencies during the planning stages of the proposed action to ensure that all potential environmental impacts are identified");
 

 id.
 

 § 380.12(e) -(f) (requiring an applicant to submit the results of required consultations with the U.S. Fish and Wildlife Service, the National Marine Fisheries Service, the State Historic Preservation Officer, the Tribal Historical Preservation Officer, or "land-management agencies" as part of its application);
 

 id.
 

 § 380.13 (requiring consultation with the U.S. Fish and Wildlife Service and the National Marine Fisheries Service pursuant to the Endangered Species Act);
 

 id.
 

 § 380.14(a)(3) (requiring project sponsor to consult with the State Historic Preservation Officer and Tribal Historic Preservation Officer);
 

 id.
 

 § 380 app. A (including consultation results as part of minimum filing requirements for application).
 

 See
 
 id.
 

 § 157 app. I § 4(a);
 

 id.
 

 § 157 app. II §§ (3)-(6), (9);
 

 id.
 

 § 380.3(b)(2);
 

 id.
 

 § 380.12(e)(4)-(5), (f)(1)-(2) ;
 

 id.
 

 § 380.13(b)(5);
 

 id.
 

 § 380.14(a)(2);
 

 id.
 

 § 380 app. A.
 

 See
 
 id.
 

 § 157.206(b)(5)(ii);
 

 id.
 

 § 380.12(j)(5), (k)(2)(ii).
 

 See also
 
 id.
 

 § 157.8(a)(1) (stating that no application will be rejected "solely on the basis of ... [e]nvironmental reports that are incomplete because the company has not been granted access by the affected landowner(s) to perform required surveys");
 

 id.
 

 § 380.12(a)(2) (stating that if a resource report is required as part of the application but is not included, "the environmental report shall explain why it is missing and when the applicant anticipates it will be filed");
 

 id.
 

 § 380.12(f)(1)-(2) (requiring survey reports to be included in the environmental report regarding cultural resources attached to the initial application);
 

 id.
 

 § 380.12(f)(2)(ii) (requiring surveys to be conducted "after access is granted" if landowners do not consent and allowing the reports to be "filed after a certificate is issued");
 

 id.
 

 § 385.2013 (requiring other agencies to notify FERC of their approval processes regarding the project, including additional information necessary for that agency to evaluate a request for approval or authorization, the time that the agency will allow the applicant to provide the additional information, and any "studies" that will be necessary for the agency to make its decision).
 

 See also
 

 Encino Motorcars, LLC v. Navarro
 
 , 584 U.S. ----, ----,
 
 138 S.Ct. 1134
 
 , 1140-42,
 
 200 L.Ed.2d 433
 
 (2018) (rejecting the application of the "distributive canon" in favor of the ordinary, disjunctive meaning of the word "or," noting that " 'or' is 'almost always disjunctive' " (quoting
 
 United States v. Woods
 
 ,
 
 571 U.S. 31
 
 , 45,
 
 134 S.Ct. 557
 
 ,
 
 187 L.Ed.2d 472
 
 (2013) ) );
 
 Patterson v. Commonwealth
 
 ,
 
 216 Va. 306
 
 , 307,
 
 218 S.E.2d 435
 
 , 436 (1975) (per curiam) ("The language 'make or draw or utter or deliver' is in the disjunctive and there is nothing in the statute to indicate that 'or' should be read to mean 'and.' Thus, 'or' is to be given its ordinary meaning.");
 
 Williams v. Commonwealth
 
 ,
 
 61 Va. App. 1
 
 , 12,
 
 733 S.E.2d 124
 
 , 129 (2012) ("We conclude the legislature intended that 'or' should have its ordinary meaning, and we therefore may not construe this disjunctive term as the conjunctive 'and.' ").
 
 See generally
 
 1A Norman J. Singer & J.D. Shambie Singer, Sutherland's Statutes & Statutory Construction § 21:14, at 177-93 (7th ed. 2009 & Supp. 2017-2018) (stating the general rule and maintaining that the words "and" and "or" are not "interchangeable" despite their misuse and that "[t]he literal meaning of these terms should be followed unless it renders the statute inoperable or the meaning becomes questionable").
 

 The use of separately enumerated subdivisions in a statute, like romanettes (i) and (ii) in Code § 56-49.01(A), in addition to the conjunction "and" further supports the conclusion that the subdivisions are conjunctive.
 
 See
 

 Coan v. State Farm Mut. Auto. Ins.
 
 ,
 
 911 F.Supp. 81
 
 , 85 (E.D.N.Y. 1996) ("Moreover, these provisions are contained in a single sentence broken down into three subdivisions and stated in the conjunctive, as demonstrated by use of the word 'and' connecting the second and third subdivisions. This conjunctive structure indicates that all three prongs must be applied ....");
 
 Stanley Jacobs Prod., LTD. v. 9472541 Can. Inc.
 
 , 586 B.R.540, 550, (Bankr. D. Del. 2018). ("Rule 6006(f)'s conjunctive structure requires a party to satisfy all six requirements."). Of the 37 cases cited by the majority in its footnote 3, only 2 involve items in a list separated by romanettes. Neither of those cases interprets a statutory text that introduces the items as "necessary" preconditions like Code § 56-49.01(A) does.
 
 See
 

 supra
 
 at 799.
 

 The term "facilities" does not include "auxiliary installations" or "replacement facilities."
 
 See
 

 18 C.F.R. § 2.55
 
 (a)-(b) (emphases omitted) (altering capitalization). Therefore, a pipeline company could modify an existing pipeline and its attendant structures without an additional FERC certificate provided that the modification satisfies the definition of an auxiliary installation or a replacement facility and that the company gives notice to landowners if such activity would involve "ground disturbance,"
 

 id.
 

 § 2.55(c). When the proposed activity does not satisfy these definitions, a pipeline company may apply for a blanket certificate.
 
 See supra
 
 note 10. Some of the activities conducted under such a blanket certificate require or contemplate surveys or studies on land to which the pipeline company may or may not already have access.
 
 See
 

 18 C.F.R. § 157.206
 
 (b)(5)(ii) ;
 

 id.
 

 § 157.208(c)(9), (e)(4);
 

 id.
 

 § 157.213(c)(6)-(7);
 

 id.
 

 § 157.214(b)(4), (c)(5);
 

 id.
 

 § 157.215(b)(1)(vi), (2)(iv);
 

 id.
 

 § 157.216(c)(5);
 

 id.
 

 § 157 app. I § 4(a);
 

 id.
 

 § 157 app. II § (3)-(6), (9).
 

 This point also refutes the majority's view that the use of "the auxiliary verb 'may' " in the provision at issue here justifies reading "and" to mean "or,"
 
 ante
 
 at 788. If that argument were true, the conjunctive list just quoted-which is also preceded by "may"-should also be read in the disjunctive, which is demonstrably wrong.